## ATLEE v. PACKET COMPANY.

1. A pier erected in the navigable water of the Mississippi River for the sole use of the riparian owner, as part of a boom for saw-logs, without license or authority of any kind, except such as may arise from his ownership of the adjacent shore, is an unlawful structure, and the owner is liable for the sinking of a barge run against it in the night.

2. Such a structure differs very materially from wharves, piers, and others of like character, made to facilitate and aid navigation, and generally regulated by city or town ordinances, or by statutes of the State, or other competent authority.

3. They also have a very different standing in the courts from piers built for railroad bridges across navigable streams, which are authorized by acts of Congress or statutes of the States.

4. A structure such as that above described, in the first paragraph of the syllabus, and which was under consideration in the present case, held not to be sustained by any of these considerations.

5. A constant and familiar acquaintance with the towns, banks, trees, &c., and the relation of the channel to them, and of the snags, sand-bars, sunken barges, and other dangers of the river as they may arise, is essential to the character of a pilot on the navigable rivers of the interior; this class of pilots being selected, examined, and licensed for their knowledge of the topography of the streams on which they are employed, and

General statement of the case.

not like ocean pilots, chiefly for their knowledge of navigation and of charts, and for their capacity to understand and follow the compass, take reckonings, make observations, &c.

6. Hence a pilot who, though engaged for many years in navigating a part of the Mississippi, had not made a trip over that part for fifteen months previously to one which he was now making, and from ignorance of its existence ran his vessel against a pier which had been built in the river since he had last gone up or down it—was *held* to be in fault for want of knowledge of the pier. He was *also* held *in* fault *for* hugging, in a dark·night, the shore near where he knew the mill and boom of a riparian owner were, and against a pier connected with which he struck, when the current of the river would have carried him into safe and deep water further out.

7. Both parties being in fault, the damages are to be divided, according to the admiralty rule in such case.

APPEAL from the Circuit Court for the District of Iowa.

The Union Packet Company filed a libel in admiralty, in the District Court of Iowa, against Atlee, founded on the sinking of a barge, for which he, Atlee, was charged to be liable, on the ground that it was caused by a collision with a stone pier built by him in the navigable part of the Mississippi River.

The pier was built in the winter of 1870–71; the collision occurred in April, 1871.

The District Court was of opinion that Atlee had not ex-·ceeded his rights as a riparian owner in building the pier where it was, in aid of his business as a lumberman and .owner of a saw-mill on the bank of the river, the pier being part of a boom to retain his logs until needed for sawing. But that court was further of opinion that by failing to have a light on this pier during a dark night, Atlee was guilty of a fault which rendered him in part responsible for the collision. As, however, the libellants were also found to be in fault, for want of care and knowledge of this obstruction on the part of the pilot, the District Court divided the damages, and rendered a decree against Atlee for half of them.

· The Circuit Court was of opinion that Atlee had no right to erect the pier where it was, and, seeing no fault on the part of the pilot, decreed the whole damage against Atlee. He accordingly appealed to this court.

The appeal was submitted to this court on printed argument, November 26th, 1873, and the decree of the Circuit Court was affirmed by an equal division of the court, which was at that time composed of eight members. On application for rehearing, this decree of affirmance was set aside and a reargument ordered on the question whether the damages should be apportioned, both parties being in fault.

The reargument was accordingly made by briefs at this term, the court being now full, and the whole matter reconsidered.

*Mr. G. W. McCrary, for the appellant; Mr. H. S. Howell, contra.*

Mr. Justice MILLER now delivered the judgment of the court, stating, at the same time, the more particular and necessary facts of the case.

No question is made of the jurisdiction of the District Court sitting in admiralty.

The testimony is very voluminous, as is also the discussion of it by counsel, but we are of opinion that the decision of the case must rest mainly on undisputed facts, or those about which there is but little conflict of testimony.

We shall assume the truth of the facts which we state as the foundation of our judgment, without a reference to the witnesses by which they are proved.

The pier against which libellant's barge struck is about thirty feet square, constructed of stone and timber, located from one hundred and forty to fifty feet from the bank of the river, in water of the average depth of twelve feet at that place, being ten feet even at a low stage of the water.

At low water this pillar is fifteen feet above the surface, and a foot or two in very high water. A part of the distance between the shore and the pier consists in low water of a sand-bar. Seven hundred feet above the pier this sand-bar tends to a point in the river made by the deposits from a small stream called French Creek, and this point, in relation to the general course of the river, projects something

further towards the centre of the channel than Atlee's pier does.

Three-quarters of à mile above the pier is the levee, wharf, or landing-place of the city of Fort Madison.

The appellant was the owner of extensive saw-mills, and of the lands on which they were located, bounded by the river at the point of the location of the pier for some distance above and below. He had built this pier, and another below it, as parts of a boom for receiving and retaining the logs necessary for use in his mill. Some kind of a boom was necessary to enable him to keep these logs safely and economically. No question is made but that if he had a right to build a pier at that place it was built with due skill and care, and that he was blameless in every other respect, unless the absence of a light at night was a fault.

The first question, then, to be decided is whether, in view of these facts, appellant could lawfully build such a pier at the precise spot where this was located.

The affirmative of this proposition was held by the learned judge of the District Court, on the general ground of the analogy which the present case bears to wharves, levees, piers, and other landing-places on navigable rivers, which are built and owned by individuals, and which are projected into the navigable channel of the river farther than defendant's pier. The cases of *Yates* v. *Milwaukee,** *Dutton* v. *Strong,*† and *The Railroad Company* v. *Schurmeir,*‡ are cited in support of the proposition. Bridges, also, across these rivers, with piers, which clearly render navigation more hazardous, and which have by this court been held to be lawful structures, are cited in aid of this view.§

What is the precise extent to which, in cities and towns, these structures, owned by individuals, or by the town or city corporations, may be permitted to occupy a portion of what had been navigable water, and under what circumstances this may be done, it is not our present purpose to

---

* 10 Wallace, 497.          † 1 Black, 25.          ‡ 7 Wallace, 272.
§ Gilman v. The City of Philadelphia, 3 Wallace, 713.

decide, nor to lay down any invariable rule on the subject. It is sufficient to say that we do not consider the case before us as falling within the principles on which that class of cases has been decided.

In all incorporated towns or cities located on navigable waters, there is in their charters, or in some general statute of the State, either express or implied power for the establishment and regulation of these landings.

This may be done by the legislature of the State or by authority expressly or impliedly delegated to the local municipal government. In all such cases there is exercised a control over the location, erection, and use of such wharves or landings, which will prevent their being made obstructions to navigation and standing menaces of danger.

The wharves or piers are generally located by lines bearing such relation to the shore and to the navigable water as to present no danger to vessels using the river, and the control which the State exercises over them is such as to secure at once their usefulness and their safety.

These structures are also allowable in a part of the water which can be used for navigation, on the ground that they are essential aids to navigation itself.

The navigable streams of the country would be of little value for that purpose if they had no places where the vessels which they floated could land, with conveniences for receiving and discharging cargo, for laying by safely until this is done, and then departing with ease and security in the further prosecution of their voyage. Wharves and piers are as necessary almost to the successful use of the stream in navigation as the vessels themselves, and are to be considered as an important part of the instrumentalities of this branch of commerce. But to be of any value in this respect they must reach so far into deep water as to enable the vessels used in ordinary navigation to float while they touch them and are lashed to their sides. They must of necessity occupy a part of the stream over which a vessel could float if they were not there.

The structure of Mr. Atlee is sustained by none of these

considerations. It is built far away from a city or town, and might as well be ten miles off as where it is, for any relation it has to the business or commerce of the city of Fort Madison, or any subjection to the control of the city authorities. His right to build this structure in the navigable channel of the river is unsupported by any statute of the State, general or specific, by any ordinance of a city or town, or by any license from any authority whatever.

Nor is there any claim or pretence that this pier is in aid of navigation. No vessel or water-craft is expected to land there, nor are there any arrangements by which they can land or be secured or fastened. The size of the pier, its sharp corners, its elevation from the water, and its want of connection with the shore, forbid any such use of it. It is intended to receive nothing that floats but rafts, and no rafts but such as its owner designs to keep there permanently for his own use.

He rests his defence solely on the ground that at any place where a riparian owner can make such a structure useful to his personal pursuits or business, he can, without license or special authority, and by virtue of this ownership, and of his own convenience, project a pier or roadway into the deep water of a navigable stream, provided he does it with care, and leaves a large and sufficient passway of the channel unobstructed.

No case known to us has sustained this proposition, and we think its bare statement sufficient to show its unsoundness.

It is true that bridges, especially railroad bridges, exist across the Mississippi and other navigable streams, which present more dangerous impediments to navigation than this pier of Mr. Atlee's, and that they have, so far as they have been subjected to judicial consideration, been upheld. But this has never been upon the ground of the absolute right of the owners of the land on which they abutted to build such structures. The builders have in every instance recognized the necessity of legislative permission by express statute of the State, or of the United States, before they

ventured on such a proceeding. And the only question that has ever been raised in this class of cases is, whether a *State* could authorize such an invasion of the rights of persons engaged in navigating these streams. This court has decided that in the absence of any legislation of Congress on the subject, the State may authorize bridges across navigable streams by statutes so well guarded as to protect the substantial rights of navigation.* But Mr. Atlee has no such authority, and pretends to none.

We are of opinion that the pier against which libellant's barge struck was placed by him in the navigable water of the Mississippi River, without authority of law, and that he is responsible for the damages to the barge and its contents.

But the plaintiff has elected to bring his suit in an admiralty court, which has jurisdiction of the case, notwithstanding the concurrent right to sue at law. In this court the course of proceeding is in many respects different and the rules of decision are different. The mode of pleading is different, the proceeding more summary and informal, and neither party has a right to trial by jury. An important difference as regards this case is the rule for estimating the damages.

In the common-law court the defendant must pay all the damages or none. If there has been on the part of plaintiffs such carelessness or want of skill as the common law would esteem to be contributory negligence, they can recover nothing. By the rule of the admiralty court, where there has been such contributory negligence, or in other words, when both have been in fault, the entire damages resulting from the collision must be equally divided between the parties. This rule of the admiralty commends itself quite as favorably in its influence in securing practical justice as the other, and the plaintiff who has the selection of the forum in which he will litigate, cannot complain of the rule of that forum.

It is not intended to say that the principles which deter-

* Gilman v. Philadelphia, 3 Wallace, 713.

mine the existence of mutual fault on which the damages are divided in admiralty, are precisely the same as those which establish contributory negligence at law that would defeat the action. Each court has its own set of rules for determining these questions, which may be in some respects the same, but in others vary materially.

The district judge was of opinion in this case that the libellant was in fault so as to require the application of the admiralty rule, and on that point this court agrees with him.

The character of the skill and knowledge required of a pilot in charge of a vessel on the rivers of the country is very different from that which enables a navigator to carry his vessel safely on the ocean. In this latter case a knowledge of the rules of navigation; with charts which disclose the places of hidden rocks, dangerous shores, or other dangers of the way, are the main elements of his knowledge and skill, guided as he is in his course by the compass, by the reckoning, and the observations of the heavenly bodies, obtained by the use of proper instruments. It is by these he determines his locality and is made aware of the dangers of such locality if any exist. But the pilot of a river steamer, like the harbor pilot, is selected for his personal knowledge of the topography through which he steers his vessel. In the long course of a thousand miles in one of these rivers, he must be familiar with the appearance of the shore on each side of the river as he goes along. Its banks, towns, its landings, its houses and trees, and its openings between trees, are all landmarks by which he steers his vessel. The compass is of little use to him. He must know where the navigable channel is, in its relation to all these external objects, especially in the night. He must also be familiar with all dangers that are permanently located in the course of the river, as sand-bars, snags, sunken rocks or trees, or abandoned vessels or barges. All this he must know and remember and avoid. To do this he must be constantly informed of changes in the current of the river, of sand-bars newly made, of logs or snags, or other objects newly presented, against which his vessel might be injured.

In the active life and changes made by the hand of man or the action of the elements in the path of his vessel, a year's absence from the scene impairs his capacity, his skilled knowledge, very seriously in the course of a long voyage. He should make a few of the first "trips," as they are called, after his return, in company with other pilots more recently familiar with the river.

It may be said that this is exacting a very high order of ability in a pilot. But when we consider the value of the lives and property committed to their control, for in this they are absolute masters, the high compensation they receive, and the care which Congress has taken to secure by rigid and frequent examinations and renewal of licenses, this very class of skill, we do not think we fix the standard too high.

Any pilot who, during the navigable season of the year 1870, was engaged in conveying vessels up and down the Mississippi River past Fort Madison, would have known of the existence of this pier and would have avoided it. Though the pilot in this case had been many years engaged in navigating this part of the river, he had been absent for over a year, and this was his first voyage in a period of about fifteen months. He, therefore, did not know of the existence of this pier, and ran against it.

Again, the natural current of the river, after striking the little projection of the sand-bar below Fort Madison, is towards the eastern shore, and away from the shore with which this pier is connected. There was a large expanse of deep water a hundred feet further out than where the vessel ran which was safe, while there must always have been felt to be more or less danger of striking the saw-logs or boom, or some other matter belonging to Atlee's mill, by hugging the shore at that point even before the pier was built. A careful and prudent pilot in a dark night as this was would, therefore, have taken the middle of the river, the course of its natural current, instead of tending inward towards the shore after passing the projecting point of the sand-bar. For these reasons we are of opinion that there was such

want of knowledge and skill in the pilot, and such want of care in his management of his vessel at that point, as to require the damages to be divided.

As there is no exception to the report of the commissioner of the District Court—to whom the question of damages was referred—based on this view, the decree of the Circuit Court is REVERSED, with instructions to render a decree on the basis of that report for HALF THE DAMAGES which he found the libellant to have suffered.