## LADD *v.* FOSTER and others.

*(District Court, D. Oregon.　August 20, 1887.)*

1. CARRIER OF PASSENGERS—OBLIGATION.

   A carrier of passengers is not an insurer; but the law holds him to a strict responsibility, and requires him to provide for their safe conveyance, so far as the same is practicable by the exercise of human care and foresight.[1]

2. CONTRIBUTORY NEGLIGENCE—ACT DONE IN DANGER.

   Where a passenger is injured by the negligence of a carrier, an act done by the former in the face of impending danger, for the purpose of avoiding the same, does not constitute "contributory negligence," although it may in fact have helped to produce the injury complained of.[2]

3. NEGLIGENCE—INEVITABLE ACCIDENT.

   When a casualty occurs, which might have been prevented by the use of known and proper precautions against the danger, it is not an inevitable accident.

4. SAME—DAMAGES FOR DEATH.

   The damages, given by section 367, Code Civil Proc., to an administrator for the death of his intestate. are, when recovered, assets of the estate, and include nothing but the probable pecuniary loss to the estate from such death; and *semble* that insurance on the life of the deceased, although assets of his estate, cannot be set off against such loss.

5. SHIPS AND SHIPPING—LIABILITY OF OWNERS FOR CAUSING DEATH.

   The propeller ferry-boat New York, on March 9, 1887, after getting 100 feet from her landing on a trip from Albina to Portland, was hailed by a person on the landing who desired a passage, when the master undertook to back in for him, and in so doing drifted broadside on the wire cable of the ferry-boat Albina, then plying between Albina and North Portland, and about 300 feet from the east shore going west. The river was much swollen and, owing to the pressure of the current and wind on the Albina, her cable was held up at or near the surface of the water, between the boat and the east shore, so that it caught the New York just under her guards, and held her there as on a pivot, while the pressure of the current on her hull forced it down stream until she capsized up stream, and then washed down stream under the wire. As the boat careened, Samuel Taylor, a passenger in the forward cabin, jumped out of the down-stream window, and was caught between the cable and the boat, as the latter passed under the former, and received injuries of which he died the same day. The deceased was 34 years of age, had been married nine years, and left a widow and three small children. He had no trade or special vocation, frequented saloons, drank more or less, and treated liberally, but did not save money or accumulate property. *Held*, (1) the death of Taylor was caused by the negligent and unskillful handling of the New York in conjunction with the cable of the Albina, which, stretched as it was. on the surface of the water, was an unlawful obstruction to navigation; and (2) that the sum of $1.500 is sufficient compensation to the estate of the deceased for the probable pecuniary loss resulting thereto from his death.

*(Syllabus by the Court.)*

Suit in Admiralty to Recover Damages for the Death of a Person.

*C. E. S. Wood* and *George H. Williams,* for libelant.

[1] As to the presumptions arising from an accident to a passenger on a railroad train, see Railway Co. v. Jones, (Ind.) 9 N. E. Rep. 476, and note; Pershing v. Railroad Co., (Iowa,) 32 N. W. Rep. 488; Railroad Co. v. Ritter, (Ky.) 3 S. W. Rep. 591.

[2] When, in order to escape a danger which is apparently impending, a person. acting with reasonable prudence, does that by which he is injured, he is not guilty of such contributory negligence as will bar recovery, even though he would but for such act have escaped the apprehended injury. Railway Co. v. Ware, (Ky.) 1 S. W. Rep. 493, and note.

*P. L. Willis*, for defendant Foster.

*H. T. Bingham*, for defendant Albina Ferry Co.

DEADY, J.  This suit is brought by William M. Ladd, administrator of the estate of Samuel Taylor, deceased, against the defendants, W. H. Foster, A. J. Knott, and the Albina Ferry Company, to recover damages for the death of said Taylor in the sum of $5,000, alleged to have been caused by the negligence and mismanagement of the master and crew of the steam ferry-boat New York, whereof said Foster and Knott are alleged to be the owners; and the negligence and lack of skill of the master and crew of the steam ferry-boat Albina, whereof the said Albina Ferry Company is the owner; and also the negligence of said company.

It is alleged in the libel that Taylor on this occasion took passage on the New York, at Albina, for Portland; that she started on her voyage up and across the Wallamet river about the same time the Albina started directly across it, the latter being held on her course by means of a wire cable stretched loosely from one bank of the river to the other; that, soon after the New York started, she was hailed by a person desiring passage, and undertook to return to her landing for him, when, by the mismanagement of her master, she drifted broadside against the wire of the Albina, and was washed under it by the current, careening up stream and onto her side in so doing, and that Taylor was severely injured by said cable, of which injuries he died on the same day.

The defendants answer separately, each admitting the character in which the plaintiff sues, and the death of his intestate by the casualty which occurred to the New York on the occasion in question.  But the defendant Knott denies that he is or ever was the owner of any interest in the New York, or that the death of Taylor was caused or occurred by or through any act or instrumentality of his.  The defendants Foster and the Albina Ferry Company also allege that the deceased was partially intoxicated, and that he contributed to the injury which caused his death by jumping out of the window of the cabin of the boat just before she passed under the wire; that, owing to his habits and incapacity to earn money, Taylor's death was no loss to his estate; and that his life was insured for $3,000, which sum his estate has gained by his death.

In his answer Foster also alleges that the drifting of the New York against the cable of the Albina was an inevitable accident, and that the upsetting of the boat was caused by the cable being held on or above the surface of the water on account of the unusual pressure of wind and current against the Albina.

From the pleadings and evidence, and an inspection of the boats and the Albina landings, I find the following facts:

At and before March 9, 1887, the Albina Ferry Company, a corporation formed under the laws of Oregon, was engaged in running the steam ferry-boat Albina across the Wallamet river, between Albina and North Portland, the same being held on her course by a wire cable loosely stretched across the river; and that at the same time the defendant Fos-

ter was engaged in running the steam ferry-boat New York on and across said river, between Portland and Albina, a distance of about a mile and a quarter. The Albina is a sidewheel boat, about 90 feet long, and the cable on which she runs passes over two sheaves or wheels under the guard at either end and on the upper side of the boat, between the hull and wheel. The New York is a propeller of fourteen tons burden, and about fifty-four feet long and twelve feet beam, with guards two feet above the water line at midships, and rising to not less than three feet, at the stern and bow, which project over the hull not less than six inches, with a house two-thirds of the length of her deck, rising six feet above the water line, in which are passenger cabins fore and aft of the engine room, the floors of which are not less than a foot below the water line, and draws five feet of water, and has a speed of eight miles an hour.

The New York's landing at Albina is a floating pontoon 20 by 40 feet, made fast to the bank, and resting on the lower side against a row of piling extending 20 feet beyond it, into the river, immediately below which is the cable and landing of the Albina. About 80 feet above the pontoon is Schafer's dock, extending into the river about the same distance as the outer end of the pontoon. Between the dock and the pontoon the river is clear, and the water about 36 feet deep, shoaling gradually back to the bank, a distance of about 200 feet. The river at this point is about 1,200 feet wide, and on this occasion was much swollen, and running between 6 and 8 miles an hour, with a moderate breeze down stream. The boats started out nearly at the same time,—about 9 o'clock A. M.; the New York probably a little the first. The master of the latter was not familiar with the boat or landing, having only been on board two days, in the temporary absence of the regular master.

When the New York had proceeded about 100 feet on her way, and was probably 50 feet from and nearly in front of the lower corner of the dock, and about 75 feet above the cable, she was hailed by a person on the pontoon, who desired a passage, when the master undertook to back in for him. This was a usual thing to do under the circumstances, and had not, so far as appears, ever been attended with any danger or inconvenience. As the stern of the boat passed into the eddy or comparatively still water below the dock, its down-stream motion was checked, while the bow, being still in the current, and somewhat across it, was swung around until the boat was turned broadside to the stream, outside of the piling. The Albina was now about 300 feet from the pontoon, going west, and her cable to the east of her, owing to the unusual pressure of the current and wind against the boat, was held on or above the surface of the water.

When the master of the New York found his boat drifting broadside onto the cable, instead of backing quickly into the upper side of the pontoon, or putting his helm hard a starboard, and going ahead with all his power, and so getting his bow up stream again, and leaving the cable behind him, apparently he became confused, and did neither the one nor the other, but signaled to the engineer to go back, and then forward until the boat was caught on the cable, just below the guards, where

she was held as on a pivot, while the current washed her hull down stream until she turned over on her side, in which position she was swept under and below the cable, where she righted up again, with her cabins full of water. As the boat turned over up stream, Taylor, who, with two other passengers, was in the forward cabin, jumped out of the window on the down-stream side, and there received the injuries of which he died. It is alleged in the libel that he was injured on his left thigh, arm, side, and hand, and internally, and this is admitted; but the evidence does not particularly disclose how it happened. It is probable, and seems to have been taken for granted, that as Taylor went out of the window he was caught between the boat and cable, and bruised and hurt as stated.

Dr. M. J. Patton, one of the persons who was in the cabin at the time of the occurrence, is a witness in the case, and testifies that as the boat went over, and Taylor got out of the window, he and the third person in the cabin were thrown down on the lower side thereof and covered with water, and when the boat righted he rose to the surface in water up to his chin, where he remained until it receded sufficiently to enable him to go through the doorway, when he got out on the forward deck, and saw Taylor floating in the water about forty feet up stream.

The master of the New York, although aware of the proximity of the cable and its elevation, does not seem to have been aware of the danger of letting his boat hang on it, subject to the great pressure of the current on the whole length of the hull and a width of not less than five feet below the fulcrum or point of contact. He remained in the pilot-house, and testified that as the Albina was receding the cable was sinking, and he had no idea the boat would go under, forgetting, apparently, that before the cable sank clear of the boat the pressure on the latter above the former would capsize her down stream.

From these facts there is, in my judgment, but one conclusion. The New York was unskillfully and improperly handled (1) while undertaking to back into the pontoon, in not keeping her head sufficiently up stream, so that when the stern entered the still water or eddy, the current would not have swept her bow round; (2) after the bow had swung down stream, in not promptly putting her helm hard a starboard and going ahead on her, so as to get away from the cable and the danger. And the master, in maneuvering as he did in proximity to this cable without knowing or taking into account the danger of being caught thereon and turned over or under it, according to its elevation, was either incompetent or grossly negligent.

The evidence is satisfactory that the defendant Knott has not and did not have any interest in the New York, and the libel will be dismissed as to him.

It is true, as contended by counsel for the defendant, that a carrier of passengers is not an insurer. But as was said by Mr. Justice FIELD in *Shoemaker* v. *Kingsbury*, 12 Wall. 376, a carrier of passengers for hire is subject by the law "to a very strict responsibility;" and therefore he is bound to provide for their safe conveyance "so far as that is practica-

ble by the exercise of human care and foresight." See *Dunlap* v. *Reliance*, 2 Fed. Rep. 251.

The defense of contributory negligence is not sustained; and therefore it is not necessary to consider what effect it would have in this suit in admiralty. In cases of collision, contributory negligence is not a bar to relief, but only a reason for dividing the damages. And this seems to be the tendency of the authorities also in cases of personal torts. *Atlee* v. *Packet Co.*, 21 Wall. 395; *McCord* v. *The Tiber*, 6 Biss. 410; *The Explorer*, 20 Fed. Rep. 135; *The Wanderer*, Id. 140.

The allegation that Taylor was intoxicated is not proven, and although he stayed in Albina the night before, and probably spent some time in the saloon, the evidence tends to show that he was not under the influence of liquor in the morning, and that he seldom became actually intoxicated. The act of jumping out of the window was a choice between hazards of drowning in the boat or outside of it, with every chance apparently in favor of the latter. As was well said by counsel, he "did exactly what the supreme law of self-preservation would impel any one to do under like circumstances. He sought the nearest and best exit upwards to light and air from the capsized and sinking boat." But, owing to the presence of the cable, the result proves that he made a mistake. However, it being the fault of the defendant that he was placed in this dangerous predicament, the consequence of his choice is justly attributed to the misconduct of the carrier. *Haff* v. *Railroad Co.*, 14 Fed. Rep. 562. As was said by Mr. Justice SWAYNE, in *The City of Paris*, 9 Wall. 638: "The acts complained of were done in the excitement of the moment, and *in extremis*. Whether they were wise it is not material to inquire. If unwise, they were errors, not faults. In such cases, the law in its wisdom gives absolution." See, also, *The Western Metropolis*, 6 Blatchf. 212; *The Ella B.*, 19 Fed. Rep. 794.

Neither was this death the result of inevitable accident, as contended by the defendant. "Inevitable accident is where a vessel is pursuing a lawful occupation in a lawful manner, using proper precautions against danger, and an accident occurs. The highest degree of caution that can be used is not required. It is enough that it is reasonable under the circumstances,—such as is usual in similar cases, and has been found by long experience to be sufficient to answer the end in view,—the safety of life and property." *The Grace Girdler*, 7 Wall. 203. If nothing had been known of this cable being on or near the surface of the water, there would be some ground for calling this affair an accident, however unskillfully the boat may have been handled in the matter of attempting to make a landing at the pontoon. But the fact of the cable being where it was, and that under the circumstances it was held on or near the surface of the water, was common knowledge, and ought to have been and was known by the master of the New York. Such being the case, whether the cable was rightfully there or not, it was one of the perils he was bound to guard against, and of which he appears to have been utterly oblivious. With a boat well furnished and equipped, as the New York is admitted to have been, the mere fact of getting on this cable un-

der the circumstances is *prima facie* evidence of negligence or mismanagement.   *Dunlap* v. *Reliance*, 2 Fed. Rep. 252.

This suit is brought to enforce a claim, for not exceeding $5,000 damages, given by section 367 of the Code of Civil Procedure, to the administrator of a person whose death "is caused by the wrongful act or omission of another."   The jurisdiction of the court is admitted. See *Holmes* v. *Railway Co.*, 6 Sawy. 262, 5 Fed. Rep. 75.   The damages, when recovered, are assets of the estate of the deceased, and must be administered accordingly,—for the benefit of creditors first, and the next of kin afterwards.   They are therefore assessed as and for a pecuniary injury to such estate, and not for the sufferings of the deceased, or as solace for the wounded feelings or mental anguish of the survivors. Nothing is allowed for bereavement, for *solatium*.   *Holmes* v. *Railway Co.*, 6 Sawy. 293, 5 Fed. Rep. 523; *Railway Co.* v. *Morris*, 26 Ill. 402; *Telfer* v. *Railway Co.*, 30 N. J. Law, 199; 2 Thomp. Neg. 1292.

As was said in *Holmes* v. *Railway Co.*, *supra*, 294, in estimating the damages, "the age, health, habits of industry and sobriety, and mental and physical skill of the deceased, so far as they affect his capacity for rendering useful service to others or acquiring property, must be considered.   Under the statute, the life of the deceased is valued according to his capacity and disposition to be useful,—to labor and to save.   The industrious, provident, and skilled are worth more to society than the indolent, improvident, and ignorant, and their death is to be compensated for accordingly."

The deceased was 34 years of age, and had been married 9 years, 8 of which he spent in Oregon.   He left a widow and three children, aged seven, four, and three years, respectively.   At the time of his death he resided in the Albina homestead, about a mile back from the ferry, in a house for which he paid one dollar per month rent and the taxes, which were probably not as much more.   The widow testifies that their household expenses were about $25 per month.   He had no trade or special vocation.   During his residence in Oregon he worked one year for wages, but where or at what does not appear.   He spent another year on the Cowlitz, taking up railway land, whatever that may be, and the year before his death he was engaged in the real-estate and employment business, in partnership with another person in this city, from which he made about $100 a month.   Some six years before his death he received about $2,500 from his father, and his effects, when he died, consisting of 160 acres of land in Clackamas county, articles of personal property, cash, and notes, were appraised at a little over $2,000.   He had also a policy of insurance in a mutual company for $5,000, which is valued at $700, and a policy of $2,000, payable to the libelant, as trustee for his children.   From this it appears that, since he was helped by his father, he has gone back rather than forward pecuniarily.   He was in the habit of frequenting saloons, drank more or less, and treated liberally; spending from $1 to $3 a day in that way.   He often spent the night in Albina in the saloon and tavern, leaving his wife and children at home alone.

It will be seen from this outline that Taylor's means of making money were both limited and precarious, and that he had little if any faculty or disposition to save or accumulate. With a household expenditure of only $300 a year, he had gone behind the last six years of his life, notwithstanding the capital received from his father. He was doubtless what is called "a good fellow," and the witnesses are evidently disposed to speak as kindly of him as they can, consistently with the facts. But I am not satisfied that his death is any serious loss to his family or estate, or that his income would ever much exceed his personal expenses. In my judgment, the damages that the libelant ought to recover on account of his death should not exceed $1,500.

The defendants claim that the insurance on the life of the deceased is a gain to his estate, by reason of his death, and therefore that amount ought to be deducted from any damages which the court may find it has sustained by reason of such death. The $700 item of the insurance goes to the estate, and there is no technical difficulty in allowing it to be set off against the claim of the administrator for damages. But the item of $2,000 does not belong to the estate. It is payable to the libelant, as trustee, for the benefit of the children, and it cannot be set off against a claim for damages in favor of the estate, because the parties are not the same. The question of the right to set off gains to the estate of a deceased person, by reason of his death, against a claim for damages on account of pecuniary losses thereby sustained, in a proceeding under statutes of this kind, can hardly be considered judicially settled, at least in the federal courts.

In *Bradburn* v. *Railway Co.*, L. R. 10 Exch. 1, it is said that in *Hicks* v. *Railway Co.*, 4 Best, & S. 403*n*, a case brought under a statute similar to this, Lord CAMPBELL instructed the jury to deduct from the damages to which they might find the plaintiff entitled any sum which he may have gained by the death in question. BRAMWELL, B., also said that the rule was laid down in that court (*Franklin* v. *Railway Co.*, 3 Hurl. & N. 211) "that the damages were to be a compensation to the family of the deceased equivalent to the pecuniary benefits which they might have reasonably expected from the continuance of his life. If, therefore, the person claiming damages was put, by the death of his relative, into possession of a large estate, there was no loss. He was a gainer by the event. And, similarly, whatever comes into the possession of the family who have suffered by the death of their relative by reason of his death must be taken into account."

But the American courts in which the question has been considered have taken another view of the matter, and hold that as the defendant in such case does not contribute to the fund derived from the insurance, and as it is not the result of or connected with the act causing the death, therefore he can have no just claim to the benefit of it in mitigation of the damages resulting from such death. *Sherlock* v. *Alling*, 44 Ind. 199; *Althorf* v. *Wolfe*, 22 N. Y. 355; *Terry* v. *Jewett*, 78 N. Y. 338; *Kellogg* v. *Railway Co.*, 79 N. Y. 77.

In the collision case of *The Propeller* v. *Mollison*, 17 How. 153, the answer

set up that the libelant (Mollison) had received satisfaction for the injuries sustained by the collisions from the insurers. The court held the defense bad, and said: "The contract with the insurer is in the nature of a wager between the parties, with which the trespasser has no concern." See, also, *The Atlas*, 93 U. S. 310. The principle involved in this case is claimed to be applicable to the one under consideration, but I think this may well be doubted.

A stipulation is filed in the case, to the effect that the validity of this defense might be considered and determined on the final hearing as if the same had been duly excepted to for impertinence. On the hearing, I understood counsel for the defendants to abandon the claim, and it is disallowed.

The only other question in the case is the one concerning the cable of the Albina. Section 2 of the act of February 14, 1859, (11 St. 383,) admitting Oregon into the Union, declares that "all the navigable waters of the state shall be common highways, and forever free." The paramount right of navigation of the Wallamet river belongs to the people who wish to use it for that purpose, and any material obstruction thereto, not authorized by competent legislative enactment, is unlawful. *Woodman* v. *Manufacturing Co.*, 1 Abb. 165; *Packet Co.* v. *Atlee*, 2 Dill. 483; *Atlee* v. *Packet Co.*, 21 Wall. 395.

In the latter case the supreme court held that a pier built in one side of the channel of the Mississippi river, as part of a boom for holding sawlogs adjacent to a mill, without legislative authority, was unlawful, and the person who erected and maintained it there, held liable in damages for a collision between it and a barge descending the river, although there was ample space for the passage of the vessel further out in the stream. It is not claimed that there is any legislative authority for stretching this cable across the river, and using it as is done by the defendant, the Albina Ferry Company. A cable lying on the bottom of the river is not an obstruction to navigation, while if stretched across at or near the surface of the water it would be. Between these extremes it may depend on circumstances. When a ferry-boat running on a cable, stretched loosely across the river in comparatively still water, only takes the wire off the ground a few feet in the front and rear of it, as it passes along, no material obstruction to navigation may result. But when, owing to the unusual pressure of the current and wind against the upper side of the boat, the wire is held at or near the surface of the water, for 300 feet at one or either end of it, in my judgment it becomes, for the time being, a material obstruction, and unlawful. In the case of *The Vancouver*, 2 Sawy. 381, this question was considered, and dismissed with the suggestion that whether a ferry cable was an obstruction or not must depend on the circumstances of the particular case.

I am satisfied that the cable of the Albina, stretched as it was on this occasion, at or near the surface of the water, for not less than 300 feet or one-fourth the width of the stream, from the Albina landing, was a material obstruction to navigation, and unlawful. In this position it materially contributed to the casualty that caused Taylor's death. In-

deed, but for the intervention of this obstruction, it would not have occurred. And whatever may be the difference, if any, in the degree of culpability of the defendants in this matter, having each contributed to the injury they are liable *in solido* to the libelant for the damages. A party injured by the concurring negligent acts of two or more wrong-doers may have redress against them all jointly. *The Alabama*, 92 U. S. 695; *The Atlas*, 93 U. S. 315; *The Franconia*, 16 Fed. Rep. 151.

A decree will be entered that the libelant recover of the defendants Foster and the Albina Ferry Company the sum of $1,500, with legal interest from March 9, 1887, together with the costs and disbursements of the suit.