### THE MABEL S.

(District Court, D. Connecticut. February 18, 1902.)

TOWAGE—CARE REQUIRED OF TUG—INJURY OF TOW ON SUNKEN ROCK.

The master of a tug, taking his tow into a harbor and to a dock with which he is unfamiliar, is bound to exercise the highest care to protect her from injury, and his failure to either take a pilot or to inquire from persons competent to give him information renders the tug liable for an injury to the tow from striking on a sunken rock, the existence of which was known to navigators familiar with the locality.

In Admiralty. Libel in rem against tug to recover damages for injury to tow.

James J. Macklin, for libelants.

Owen & Sturges, for claimants.

TOWNSEND, District Judge. The material facts herein are undisputed, and are as follows: On March 25, 1900, the steam tug Mabel S. took in tow at Hoboken, N. J., the barge James E. English, which was loaded with pig iron, and drew about seven feet of water,

to be towed to the Brown Cotton Gin Company's docks in New London, Conn. The tug and tow reached New London on March 26th, where the tug was taken alongside, and they then proceeded up the harbor until they came near to Scott's Wrecking Dock, about a quarter of a mile from destination. Here Capt. Eldredge of the tug hailed one of the tugs of the Scott Wrecking Company, and asked if any one would show him the way into the Brown Cotton Gin Company's dock, or whether there was anything in the way of going there; but, receiving no answer, he proceeded to Scott's dock, and made fast, and he, with Capt. Barker of the tow, went around to the Cotton Gin dock to learn whether there were any obstructions in the way. Capt. Eldredge had been in New London harbor frequently, but had never been to the cotton gin company's dock. On arriving at the office of said company, Capt. Eldredge stated to the man in charge that he had come to get information about the approach to the dock. He sent them to the stationary engineer of the company, who, he said, would tell him (Capt. Eldredge) all about it. This engineer said there was no obstruction, and that schooners drawing more water than this barge beat in and out there; and, having been told by Eldredge that the tide was rising, he said, "Come right in now from where you are, and you won't touch anything." He then told Capt. Eldredge to take the range from Scott's dock over to their dock, which, he said, was the range they all took to come in there. In conclusion, the engineer said: "I want you to understand one thing: That this company will not be responsible for any information I give you. * * * If you come in here, you come at your own risk." The tide was then rising, and the two captains went to get dinner. When the tide was about half flood, they started for the cotton gin company's dock. Capt. Eldredge backed off about 150 feet, then turned, went on till he got the range the engineer had given, and then headed for the cotton gin company's dock, going slowly until the barge struck a rock. He did not make any soundings. The barge received serious injuries, for which damages are claimed herein. The libel charges three acts of negligence against the tug: First, in not avoiding the said rocks, they being well known to navigators on the Thames river and vicinity; second, in that the man in charge of the navigation of the tug was incompetent, and not familiar with the waters of the said Thames river and its tributaries; third, in not towing the said barge through the usual path or channel in said Thames river, and where there was a sufficient depth of water at all times for said barge.

The rock on which the barge struck was not buoyed, or shown on the government chart. Capt. Eldredge had examined the chart, and found soft bottom indicated, and no obstructions shown thereon, before he made any inquiries. Two questions are presented, namely: (1) Was the rock such a well-known obstruction that the master of the tug should be chargeable with knowledge thereof? (2) Was he negligent in failing to get further information? Five witnesses were examined on the first point. There is some confusion in their testimony between the rock on which the barge struck and another rock lying within about 50 feet of it; but this is not material, as either rock would be likely to be an obstruction to such a tug and tow going to the

cotton gin company's dock. Hunt, a steamboat pilot, had known of these obstructions for 14 years. Scott, another pilot, knew of rock there, and had supposed it was all one reef, until after the accident, when he discovered there were two rocks, as aforesaid. Terry, a vessel broker, who is not a licensed pilot, but who, as master of vessels, had frequently gone to the cotton gin company's dock, had never heard of said rock, but he had not been there with a vessel for six years. Bate-well, an experienced pilot, had never heard of this obstruction, but he had not taken a vessel to the cotton gin company's dock for 13 years. Colfer, who was there last in 1893 or 1894, always took a circuitous course in going in and out, but had never heard of any obstructions. "The pilot of a river steamer, like the harbor pilot, is selected for his personal knowledge of the topography through which he steers his vessel. * * * He must also be familiar with all dangers that are permanently located in the course of the river, as sand bars, snags, sunken rocks or trees, or abandoned vessels or barges. All this he must know and remember and avoid. To do this he must be constantly informed of the changes in the current of the river, of sand bars newly made, of logs or snags or other objects newly presented, against which his vessel might be injured. In the active life and changes made by the hand of man or the action of the elements in the path of his vessel, a year's absence from the scene impairs his capacity —his skilled knowledge—very seriously in the course of a long voyage. He should make a few of the first 'trips,' as they are called, after his return, in company with other pilots more familiar with the river." Atlee v. Union Packet Co., 21 Wall. 389, 22 L. Ed. 619. Tested by these requirements, the conduct of the master of the tug was negligent. The pilots familiar with this locality knew of this rock, or of the dangerous reef of which it appeared to be a part. It had been known for some years prior to this accident. Capt. Eldredge either should have known of it, or, never having gone to this dock before, he should have used the highest degree of care to avoid all risk due to his ignorance. If he did not choose, on this, his first trip, to secure the services of a competent pilot, he should at least have taken measures sufficient to acquaint himself with this obstruction, and should have assured himself by competent evidence of a safe passage around them. That he recognized this obligation is indicated by his admissions. He had hailed Capt. Scott's tugs, and failed to get the necessary information. Later, Capt. Barker told him if he would go to Capt. Scott's office he could probably find out the passage, or get some one to take them in. He declined to do this. His testimony on this point is as follows:

"When you go to a man and ask him a simple civil question like that, and he won't answer you [referring to his experience with Scott's tugs], you are disgusted with that man altogether, and you don't want any information from him at all. Q. You took the chances, then, on a landsman—is that it— giving you the information? A. I took the chances on information from men that were connected with the dock,—connected with the wharf,—and supposed to know the water around it and in the approach. Q. You took the chances, then, on getting your information from a land engineer, instead of from a navigator,—is that it? A. Well, that is what I did, because I would rely on it, and have relied on such information in a good many instances

before; yes, sir. Q. Because you were disgusted with the man in the tug-boat, who, you say, refused to answer you,—is that it? A. That is about it. I would not ask them any more about it."

Let a decree be entered for the libelants, and let the case be referred to a commissioner to ascertain the damages suffered.