## F. S. ROYSTER GUANO CO. v. OUTTEN et al.

### THE NANNIE MAY.

(Circuit Court of Appeals, Fourth Circuit. April 6, 1920.)

### No. 1761.

Wharves ☞20(3)—Loading crane, left extending over slip, unlawful obstruction.

> A loading crane, erected without permission of the Secretary of War, traveling on a track along the edge of a wharf, and which, although movable, was left at a time when not in use extending 38 feet over the water of the slip, *held* an unlawful obstruction to navigation, and the owner *held* liable for injury to a boat which, without negligence on its part, struck the crane in passing out.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Suit by L. A. Outten, master of the schooner Nannie May, against the F. S. Royster Guano Company with intervening petition by the Pocomoke Guano Company. Decrees for libelant and intervener, and respondent appeals. Affirmed.

For opinion below, see 258 Fed. 955.

Cadwallader J. Collins, of Norfolk, Va., for appellant.

G. M. Dillard, of Norfolk, Va., for appellees.

Before PRITCHARD and WOODS, Circuit Judges, and WATKINS, District Judge.

PRITCHARD, Circuit Judge. This is an appeal by the F. S. Royster Guano Company, a corporation, from a decree of the District Court at Norfolk, Va., sustaining a libel in personam in admiralty and giving damages against it for the full amount claimed by L. A. Outten, master of the schooner Nannie May, appellee, for $1,315, with interest from February 7, 1919, and also giving damages against said F. S. Royster Guano Company for the full amount claimed by the Pocomoke Guano Company, a corporation, for $699.75, with interest from February 7, 1919. The Pocomoke Company filed its petition, praying to be admitted as a party in the pending libel, and was allowed to assert its demand for damages against the F. S. Royster Guano Company for the loss of commercial fertilizers that were on board the Nannie May when she sank. So far as the Pocomoke Guano Company is concerned its petition rests upon the same alleged negligence as that for which L. A. Outten brought his libel in personam, and all assignments of error raised against the libel apply with equal force to the petition.

The libel was brought to recover damages for the negligent maintenance of a loading crane, variously referred to in the evidence as a derrick, a traveling crane, and shears, erected without making application to the Secretary of War for his approval and authorization, which, it is claimed, constituted an unlawful obstruction to navigation, and with which the Nannie May collided. An ocean-going barge, variously estimated at from 200 to 250 feet in length, was lying along

the wharf in question. Along the edge of the wharf there ran a track, upon which the crane in question was moved. This crane, on the day in question or the day before, had been used to unload the barge, but had not been in use for some time previous to the time of the landing of the Nannie May at the wharf, and it had been left suspended over the center of the barge. The mast of the Nannie May was 45 feet high and struck the crane about 6 inches from the top, and it thus appears that the crane was suspended about 45 feet above the water. The beam of the barge was about 30 feet, and the crane projected about 8 feet beyond the barge over the water. In his testimony in chief Outten states that the crane projected 10 or 12 feet beyond the barge. The extreme length of the crane was about 38 feet. The loading crane has occupied its present location since 1912.

In his redirect examination E. M. Griffin is reported as saying that the "shears were about 125 feet long—at least that, between 125 and 150 feet." It is insisted by Proctor for appellant that the reporter misunderstood Griffin as to this point, inasmuch as on his direct examination witness stated that the beam of the barge was about 30 feet and that the derrick projected about 8 feet from the barge.

The Nannie May on the day in question made her first landing in a slip, astern of the barge, to load a cargo of commercial fertilizers; but, when told that he could not load at that point, Capt. Outten left the stern of the barge and came around it to the other end. Capt. Outten said that the crane was suspended over the barge when he landed astern of her, that he passed around the crane without trouble in order to reach the bow of the barge, and that he saw "the shears over the barge" when he left the stern to come around to the bow of the barge. It also appears from the evidence that Griffin, an employé of the F. S. Royster Guano Company, warned Capt. Outten "to be careful of the shears" when the Nannie May moved from the stern to the bow of the barge. A Capt. Willey, the owner of a small boat very similar to the Nannie May, also landed in the slip astern of the barge some three or four hours before the Nannie May arrived. Capt. Willey states that his boat and the Nannie May were tied together lying alongside, that they went around together from the stern to the bow of the barge, and that "it happened that I noticed the shears. I was next to the dock, and happened to see them just in time to go back on both engines and get out of the way of the derrick." Why Capt. Willey's boat and the Nannie May were lashed together does not appear from the evidence.

After moving from the slip around the barge, the Nannie May lay alongside the wharf for several hours loading, and Capt. Willey's boat lay alongside the Nannie May. The two boats left the wharf at practically the same time, going out in the same way that they came, except that they did not again pass around the barge. Capt. Willey's boat was somewhat ahead of the Nannie May, but the evidence as to how far is conflicting. Oscar Wilson, a witness for the F. S. Royster Guano Company, states that one boat was about 12 inches behind the other, and that the "other boat struck the Nannie May; if it hadn't, I guess they would have passed;" and that "what caused Capt. Wil-

ley's boat to strike the Nannie May was by running too close together, and both leaving at the same time, the stern of one striking the other, turning off from the dock." And Ben Blunt, also a witness for the F. S. Royster Guano Company, states that "they both went out together, and the one that was ahead struck the Nannie May about amidship, and caused her to sheer into the barge and strike the shears." On cross-examination Ben Blunt further stated that "they started bow to bow, and when they got about 38 feet away from the wharf, coming down stream, I saw Capt. Willey's vessel turn out and hit the Nannie May—turned against her and pushed her round. J reckon she was about 4 or 5 feet ahead at that time; it looked to me about that." On being recalled, both Capt. Outten and Capt. Willey denied these statements.

The first question in the consideration of the matters involved in this controversy is as to what constitutes an obstruction to a navigable stream. U. S. Comp. Statutes 1916, § 9910, is as follows:

"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited. * * *"

It is the well-established policy of the government to keep navigable streams clear of unauthorized obstructions, so as to render them safe for the passage of vessels. It is just as essential to keep our waterways clear of obstructions which might interfere with the free passage of vessels as it is to keep streets and highways so as to permit the free passage of vehicles. Therefore Congress has, as we have stated, adhered strictly to the policy of not permitting any unauthorized obstructions to navigable waters. Any other policy would soon render it unsafe and inconvenient to travel on the public highways and navigable waters. The extent to which navigable waters and public highways are to be kept free from obstruction has been before the courts many times.

In the case of Richmond v. Smith, 101 Va. 166, 167, 43 S. E. 346, the court says:

"As to precisely what the extent of the obstruction must be, in order to create a nuisance, is not definitely settled by the cases. But it would seem that, strictly speaking, any encroachment upon any part of a highway, whether upon the traveled part thereof or on the sides, comes clearly within the idea of a nuisance. * * *"

The requirement of the various statutes in this respect is based upon the theory that the public highways and navigable streams belong to the public, and it is to protect the public in the enjoyment of such right that it is made unlawful to obstruct either a navigable stream or a public highway. Any obstruction not authorized by legislative authority is therefore deemed a nuisance.

In the case of Woodman v. Kilbourn Mfg. Co., 30 Fed. Cas. 503, it is said:

"It is not for an individual, but for the state, to decide whether the whole of a public highway is necessary for the public accommodation or not; hence any partial obstruction of any navigable stream or highway, or any portion of it, without legislative authority, is a nuisance. The public have a right to

the use of the entire highway: and no citizen can appropriate a portion, upon the principle that enough remains for public use."

In the case of Atlee v. Packet Co., 88 U. S. (21 Wall.) 394, 22 L. Ed. 619, the Supreme Court said:

"He rests his defense solely on the ground that, at any place where a riparian owner can make such a structure useful to his personal pursuits or business, he can, without license or special authority, and by virtue of this ownership, and of his own convenience, project a pier or roadway into the deep water of a navigable stream, provided he does it with care, and leaves a large and sufficient passway of the channel unobstructed. No case known to us has sustained this proposition, and we think its bare statement sufficient to show its unsoundness."

In other words, any obstruction of a navigable stream must be subordinate to the right of navigation. When we consider the facts in this case in the light of the case above cited, we find that the derrick which the defendant permitted, while not in use, to project at least 38 feet over the navigable water, was not only dangerous, but an obstruction not authorized by law. The obstruction in question being in the air, a considerable distance from the water, rendered it all the more difficult for one navigating a vessel to determine accurately as to the proximity of such an obstruction to the top of a vessel. If this crane, after being used, had been immediately turned to one side, so as not to project over the navigable waters, and at all times kept in that position while not being used, it could not have been said to be an unauthorized obstruction. Even if this obstruction had been authorized by the proper authorities, it would have been just as much an obstruction to navigation as would have been a drawbridge left in an improper position, when not being manipulated so as to permit vessels to have an easy passage.

It is shown that the derrick of appellant while not in use, as we have said, projected at least 38 feet over the navigable water. However appellant seeks to escape, or at least diminish liability for damages, by attempting to establish contributory negligence on the part of the appellees, and in support of this cite the language of the Supreme Court in Gring v. Ives, 222 U. S. 370, 32 Sup. Ct. 167, 56 L. Ed. 235. An examination of that case shows that the language cited was not the language of the Supreme Court, but of the court below. That was a case of fault acknowledged by the master of the tugboat, and nothing appears as to why he, "instead of following the usual course, ran diagonally towards the shore, and, striking the marine railway of plaintiffs, damaged it." The facts of that case are not analogous to the instant case, and have no application to the same. We think that the facts in the case of Panama Railroad v. Napier Shipping Co., 166 U. S. 287, 17 Sup. Ct. 572, 41 L. Ed. 1004, are materially different from the facts of this case. There the agent of the shipping company knew of the sunken vessel, and with this knowledge landed his ship in a dangerous place. In the instant case the appellee landed in a safe position, but the agent of appellant directed him to change his position, and directed him where to land, with full knowledge that he had to depart from that landing.

Capt. Willey, of another vessel, testified as follows:

"Mr. Outten and myself were lying alongside; in fact, I went there in the morning part of the day, and lay waiting for him to go to Pocomoke and come back and load. He came, and stopped at the lower end of the barge, the same as I loaded, expecting to load there, and some man came out and gave him orders to go to the bow of the barge to get his load, and of course he went to the bow to get his load, and I went with him. The man came from out of the building; I did not pay attention; first a white man, and then a colored man, will come and tell you where to go. I understood he was connected with the Royster Guano Company. He was one of the men there."

In the Panama Railroad Case the obstruction was a sunken wreck, which was not under the control of the defendant; whereas in this case appellant could by a simple turn of the wheel have moved the derrick so as to obviate the possibility of danger. The crane being so constructed as to be movable, this clearly places it in the category of drawbridges over navigable waters, and the rules applying to the operation of drawbridges apply with equal force to a crane, which was "traveling" or movable. In the case of Central R. R. Co. v. Penna. R. R. Co., 59 Fed. 193, 8 C. C. A. 86, the court said:

"It was the duty of the appellant, in exercising its rights to maintain a drawbridge over navigable waters to respect the rights of the public, and in this behalf to exercise reasonable care, not only not to impede the safe navigation of passing vessels, but also to obviate any unnecessary delay to such vessels."

Also in the case of Clement v. Metropolitan West Side El. Ry. Co., 123 Fed. 273, 59 C. C. A. 291, the court said:

"A bridge spanning a navigable river is an obstruction to navigation, tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary; the right of navigation being paramount. It is incumbent upon the owner that the bridge be so constructed that it may be readily opened to admit the passage of craft, and maintained in suitable condition thereto. It is also his duty to place in charge those who are competent to operate the bridge, to watch for signals, and to open the bridge for the passage of vessels, and for the performance of such delegated duty he is responsible."

In those cases the owners and operators of authorized drawbridges over navigable waters were held liable for the negligent obstruction of navigation which resulted in injury to the libelants' vessels. As we have already stated, it is difficult to estimate as to the proximity of an obstruction overhead, as in this instance. Capt. Willey was a disinterested witness, and in testifying as to this point said:

"It looked like 3 or 4 inches from the top of the mast was hit; the end of the top. It came pretty near getting under it. If he had had 6 inches, he could have made it. Any one standing on the deck of the vessel could not tell whether it would hit it or not, with a mast that high. It was not like an obstruction in the water."

Oscar Wilson and Ben Blunt testified on behalf of the appellant that, as the Nannie May and Capt. Willey's vessel were leaving the wharf abreast of each other, the vessel of Captain Willey struck the Nannie May and caused her to run into the derrick. This testimony is contradicted by Capt. Outten and Capt. Willey, who testified as follows:

Captain Outten: "Q. Captain, two of the colored boys, Wilson and Blunt, have testified that this accident was caused, or at least contributed to by Capt. Willey's boat sheering off, and her stern coming in contact with your vessel, and shoving it round in the direction of this derrick. Tell the court whether there is anything in that? A. 1 never touched Capt. Willey's boat. His boat did not touch me going out. When the accident happened, I judge they were 25 yards apart."

Captain Willey: "I did not touch his boat; I was ahead; how could I touch him; we were both going out. When I got abreast of the derrick, he was 35 yards behind me."

Capt. Willey's explanation of the accident, to-wit, that the appellee's vessel was forced into the unlawful obstruction owing to the combined force of the tide, and the failure of appellee's engine to function properly, is probably the true one. On this point he says:

"I was going faster than he was, and I was leaving him all the time. The tide must have been carrying him very near as much as his own power. I noticed his engine didn't start; it started on one cylinder, hitting first one and then the other slowly."

The court below found in favor of the appellee on this point. In view of these facts, we think that appellant failed to show that this accident was due to the contributory negligence of appellee. The court below, after careful consideration of the evidence, has found that this accident was due to the negligence of appellant, and that appellee did not contribute thereto.

Under all the circumstances, we think the decree of the lower court should be affirmed.