The owners of the Sampson also filed a libel in rem, in the district court, against the Iola, to recover salvage for towing her, after the collision, to the Atlantic docks, for repairs. The district court dismissed that libel, and the libellants appealed to this court. That appeal was heard at the same time with the appeals in the suit against the Sampson, and was argued by the same counsel. This court affirmed the decree below, with costs, holding that the Sampson could have no just claim for salvage for doing what was in her power towards saving the Iola; that the Sampson herself was the most deeply interested in that service; that, if it had not been rendered, the Iola would probably have sunk, resulting in a total loss of vessel and cargo; that the salvage service was, therefore, rendered by the steamer for her own benefit; and that there was, of course, no pretext for charging it on the brig.

---

## Case No. 12,280.

### The SAMPSON.

[3 Wall. Jr. 14; [1] 3 Am. Law Reg. 337.]

Circuit Court, E. D. Pennsylvania. Oct. Term, 1854.

COLLISION—STEAM TUGS—MASTER AND SERVANT—RESPONSIBILITY OF STEAMERS.

1. The court, confirming its decision in the case of Smith v. The Creole [Case No. 13,033], applies more strongly the doctrines of that case; and holds that when even small vessels, as coal heavers, are in tow, the towing boat is the servant of the vessel towed, and that the tug, being thus bound to obey the orders of the other vessel, is not responsible, though, in point of fact, giving orders to her, for damages in the proper course of its employment.

[Cited in Boyer v. The Wisconsin & The Hector, Case No. 1,756; The Belknap, Id. 1,-244; Albina Ferry Co. v. The Imperial, 38 Fed. 617.]

2. Though the rule of porting the helm is obligatory, when, in ordinary cases, vessels meet in the same line, it is not one always to be observed when they are in parallel lines. Circumstances control the rule; and, when a boat is

---

1 [Reported by John William Wallace, Esq., and here reprinted by permission.]

moving against the tide, slowly and with difficulty (as when tugging a heavy vessel), and is out of the centre of the channel, which is left free to the other, the rule can have no application.

3. Steamers, especially large steamers, are held to the strictest care possible when in ports or in the neighborhood of sailing and smaller vessels; and must move slowly and with extreme circumspection. And if, from violation of this duty, small or sailing vessels are put suddenly into confusion and jeopardy, the court will not inquire whether the rules applicable to ordinary cases of meeting, have been strictly observed by the weaker vessel, or not; but will hold the steamer responsible, as reckless, for all injury happening to or committed through the act of the weaker vessel, from mistake caused by the embarrassment natural to the condition into which the steamer has put this weaker vessel.

[Appeal from the district court of the United States for the Eastern district of Pennsylvania.]

A large steamer was coming, on a moonlight and pretty clear night, up the Delaware and opposite the city of Philadelphia, at her ordinary speed of eleven miles an hour; the tide being full in her favor, and she having come up the middle of the channel (here about nine hundred and sixty feet wide), that she might have the whole benefit of the current. A small tow steam tug, the Sampson, of sixty-five horse power, was towing, at the same time, in an opposite direction, a heavily ladened coal schooner of one hundred and forty-five tons, which was attached to it by a hawser, fifteen to twenty fathoms long. The tug and schooner were working along at the rate of two and a half miles an hour, against the tide, and were hugging the shore (being within from ninety to one hundred and sixty feet of it) of an island opposite the city; as well that they might avoid the strength of the current against them, as that they might be out of the way of ferry-boats emerging suddenly from the city docks opposite. They could go no nearer to the shore of the island, with safety, than they were. The steamer being near her place of landing, ported her helm and sheered towards the island for the purpose of rounding to at the city wharf. She had not seen the tug; and the schooner—in consequence of her spars being without sails, her motion being scarcely apparent, and her position being close upon the island where vessels often anchor to await a change of tide—was mistaken by the steamer for a vessel at anchor. The tug seeing the movement of the steamer in rounding to, and clearly foreseeing a collision if she, herself, went on her own course, starboarded her helm to get still closer to the island. The schooner, who had been directed by the tug's pilot to follow in the wake of the tug, did the same. The tug escaped, but the schooner was brought directly into the line of the steamer, and notwithstanding all the steamer's efforts at this moment, by porting her helm, to get between the schooner and the island, a serious collision took place. Had the schooner ported her helm and cut the tow-line, she would probably have escaped.

Libels being filed by the steamer against the tug and schooner, and by the schooner against the tug and steamer, the district court was of opinion, on this case, that the collision was directly attributable to the act of the tug in starboarding her helm and so taking the schooner nearer to the island, instead of doing the reverse manœuvre, of porting, which would have taken both the tug and her tow out into the channel. The tug was accordingly condemned by that court to answer the damages which both steamer and schooner had suffered.

Mr. Serrill, for the schooner.
Ludlow & Cadwalader, for the steamer.
Gerhard & Williams, for the tug.

GRIER, Circuit Justice. By the decision of this court in the case of Smith v. The Creole [Case No. 13,033], the remedy of the steamboat is to be sought against the schooner, and not against the tug employed to tow her. The tug was the servant of the schooner, and bound to obey the orders of her master, and if the master choose to follow the directions of the pilot or steersman of the tug, and trust to his skill instead of his own, the acts of the pilot may be justly considered as his own, and adopted by him. The remedy of the owners of the steamboat (if entitled to any) is therefore against the schooner, and not against its servant, the tug. Nor have we any evidence of any disobedience of orders by the tug that should render it liable to the schooner. For if the master of the schooner gave no directions to the pilot or steersman of the tug, but submitted his own will to the pilot's skill, he has adopted his acts, and has no right to charge the owners of the tug for his own negligence. The tug Sampson and owners are therefore entitled to a decree in both cases.

Assuming the schooner to be liable for the acts of her servant, the contest between her and the steamboat remains to be considered.

The tug and schooner were hugging the shore. It was, under the circumstances, their proper place. When the tug saw the steamboat coming up the river she was bound by no rule of navigation, or common sense, to cross the channel to avoid a steamboat coming up the middle of the river. She had left eight hundred of nine hundred and sixty feet of the channel free to the steamboat. Knowing her own position at one side of the channel, the tug could not anticipate the gross mistake made by the steamboat with regard to her position, or that she would needlessly cross the channel, and run under the bows of the tug and schooner. Both were carefully keeping out of harm's way, when the steamer suddenly comes down upon them by sheering out of her proper course, and the tug escapes destruction the

best way she can, in the sudden emergency produced by the mistake and reckless haste of the steamboat. Whether the tug turned to the right or left to save herself from destruction, is of no importance. It was the mistake or carelessness of the steamboat to put her to the necessity of turning either way. The rule of porting the helm where vessels are meeting in a line, should invariably be observed; but where vessels are in parallel lines, when one boat is working against tide, and with difficulty tugging a heavy vessel, keeps near the shore, and leaves a free channel to the other who is coming up in the middle of it, the rule of porting the helm can have no application.

If the tug had ported her helm on seeing the steamer, she would have thrown her long tow obliquely across the middle of the channel, up which the steamboat was coming. The steamboat by turning out of her course to run under the bows of a vessel hugging the shore, when a wide channel was left open before her wholly unobstructed, cannot now be heard to complain of the comparatively helpless and slow moving vessels for not exercising more skill in getting out of her way. It was the duty of the steamboat, moving with great power and momentum, with a tide in her favor, to keep out of the way of small and slow vessels, one of which was helpless, and the other slowly and painfully dragging behind her. The officer of the steamboat should have slackened her pace in order to have time to observe the difficulties of his position and to ascertain the correct situation of vessels, whether moving or stationary, in the harbor. With her huge mass and great momentum the steamboat cannot be allowed to dash as a triton or leviathan among minnows into the midst of smaller vessels in a port, calling upon them to take care and keep out of the way, or to learn at their cost the rule of "Port your helm."

Every one knows the deception as to the relative position of bodies to which those on board a vessel, moving into port, after night are subject. Moonlight may extend the range of vision, but it will nevertheless subject the most sharp-sighted to great mistakes in a port where some objects may be moving swiftly, others slowly, and others be at rest. The headway or momentum of a large steamboat, moving at a velocity of ten or eleven miles an hour, cannot be so suddenly checked, on the discovery of an error, as to hinder disastrous collisions, and there cannot be a better rule of navigation, than that which will subject steamboats to all the damage occasioned by such reckless conduct in a crowded and narrow port after night. The steamboat must therefore bear its own injury, and must also answer for the damage done to the schooner.

Decree reversed.