VANCE (SUYDAM v.). See Case No. 13,657.

VANCE, The A. D. See Case No. 92.

VANCLEVE (STEVENS v.). See Case No. 13,412.

## Case No. 16,838.

### The VANCOUVER.

[2 Sawy. 381; [1] 18 Int. Rev. Rec. 103.]

District Court, D. Oregon.　April 15, 1873.

COLLISION BETWEEN STEAMERS—ENGINEER, NOT LICENSED—GUY ACROSS A RIVER—BOATS PASSING EACH OTHER.

1. Although at the time of a collision the engineer on the injured boat is not licensed, this circumstance will not prevent a recovery of damages for the injury, where the evidence shows that the want of a licensed engineer did not contribute to the collision.

2. A wire cable laid across the Wallamet river as a guy on which to run a ferry boat, is not an unlawful obstruction to navigation, unless it actually prevents or renders hazardous the navigation of the river by others.

[Cited in The Swan, 19 Fed. 457; Ladd v. Foster, 31 Fed. 834; Albina Ferry Co. v. The Imperial, 38 Fed. 617.]

3. When vessels are approaching each other in what the pilot rules call "the first situation," the boat that is crossing the bow of the other is entitled to keep its course, and the other should port its helm and pass astern.

In admiralty.

E. C. Bronaugh and John Catlin, for libellant.

J. F. Caples and Julius Moreland, for claimant.

DEADY, District Judge.　This is a cause of collision. The libel was filed January 11, 1873. The following facts are admitted by the pleadings or proven by the evidence:

On January 6, 1873, the libellant, Joseph Knott, was the owner of a side-wheel steam ferry-boat, called the Portland, which was then, and a long time before, plying to and fro across the Wallamet river, between the foot of Stark street, in the city of Portland, and L street, in East Portland, a distance of about 1,200 feet. The hull of the Portland is ninety-five feet in length, and the aprons attached to each end are about twelve or fifteen feet long. She was steered or guided by a steel wire cable or guy four inches in circumference, laid across the bed of the river, and passing through a sheaf at each end of the boat, a few feet back of the aprons.

The Vancouver is a stern wheel steamboat about one hundred and twenty feet long, which at and before the time of the collision, was making daily trips between Portland and Vancouver. About five o'clock in the afternoon of January 6, the Vancouver left her berth, about one hundred and fifty feet above the west landing of the ferry-boat, for Vancouver, having on board a party of excursionists. There was a four knot current in the river, and the wind was high and down stream. In leaving her wharf, the Vancouver usually backed down across the route of the ferry-boat, and then turned her bow

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

down stream, but on this occasion she went ahead about four hundred feet.

When the Vancouver gave the whistle to cast off from her wharf, the Portland was about two hundred feet from her east landing, crossing to the west with passengers; and her pilot, assuming that the Vancouver would back down in front of her, stopped her. but the Vancouver going up stream, the Portland resumed her 'voyage, and when about six hundred feet from the east shore, gave one whistle as a signal to pass to the right. The Vancouver, which at this time was swinging round into the stream about four hundred feet above and two hundred feet west of the ferry-boat, answered the signal promptly with one whistle. By the time she got fairly turned around and pointed down stream, she was five hundred feet from the west shore, and making eight or ten miles an hour. When within two hundred and fifty feet of the ferry-boat, and when the bow of the latter had crossed her jack-staff, she gave two whistles to signal that she would pass to the left, in front of the ferry-boat, and starboarded her helm so as to point her bow quartering toward the west shore.

To this signal the ferry-boat promptly responded with one whistle, thus indicating her intention to pass to the starboard, according to her original purpose, but seeing that the Vancouver was apparently coming down on them, the pilot immediately gave the signals to stop and back, which were obeyed. The pilot of the Vancouver, when within one hundred feet of the ferry boat, seeing that he could not pass clear, gave the signals to stop and back, which were obeyed, but in a few seconds thereafter the collision occurred by the Vancouver striking the Portland obliquely ten or twelve feet back of the forward apron, crushing in her guards, and cutting or breaking the wire cable at the point where it came in contact with the cut-water of the former. The collision and resistance of the wire checked the forward motion of the Vancouver when she backed out and passed on, to the right, without stopping. The Portland floated down stream without a guide, until she was brought under control by means of a steering oar. when she steamed back to the east shore—being unable to make the west one on account of the breaking of the apron chain, which let the apron down into the water, and rendered it impossible to propel the boat in that direction.

Upon this trip the engineer on the ferry-boat was not a licensed one, but the proof is satisfactory, that he obeyed all the signals promptly, and that this circumstance in no way contributed to the collision. Both boats were under the charge of licensed pilots.

The evidence is conflicting. as to whether either of the boats was backing at the moment of the collision. It is probable that both of them had shut off steam, and that the Vancouver had commenced to back her wheel so as to check her speed, but not to stop her way. The pilot of the Vancouver testifies that when he gave the signal to stop and back, she was only about one hundred feet from the Portland. At that time she was making eleven feet to the second. From the time of giving those signals, nine seconds would take her across the course of the ferry-boat, while the latter was approaching the point of collision at a speed of six feet to the second.

Under the circumstances, it does not appear probable that the collision could have been prevented when the pilot of the Vancouver gave the signals to stop and back, because at the rate she was then going, with the wind and current as they were, she could not stop her way in one hundred feet—something less than her own length. This being so, it is necessary to go back and ascertain by whose fault these boats were brought into this dangerous proximity and condition.

When the Vancouver blew the two whistles, the boats were in what the pilot rules call the "first situation." The ferry-boat was crossing the bows of the Vancouver at right angles, to port, and was therefore entitled to keep on her way, while for the same reason it was the duty of the latter to. port her helm, and pass astern of the former. There is no doubt but that if this rule had been obeyed by the Vancouver the collision would not have happened. Prima facie, therefore, she is in fault, and should suffer the loss sustained by the collision.

It may be said that if the ferry-boat had stopped and backed, when the Vancouver gave the two whistles, that the latter could have passed to the left without collision. But the Vancouver had no right to give this signal. It was her duty to pass to the right, particularly after having signaled her intention so to do. Of course it was the duty of the ferry-boat whether first in fault or not, to avoid a collision if possible. But allowance must be made for the circumstances in which she was placed by the prior misconduct of the Vancouver.

She could only move back and forth upon one line, and her deck was but two or three feet above the water. The Vancouver, a double-deck boat, at a distance of two hundred and fifty feet, while going at the rate of eight or nine miles an hour, down stream, suddenly changes her course, and signals her intention to cross the bow of the ferry-boat. It is very doubtful if the way of the boat could then have been checked soon enough to have prevented the collision. But if it now appeared probable that the collision might have been avoided, by immediately stopping and backing the ferry-boat, it must be remembered that the persons in charge with the passengers were in great danger of their lives by this sudden and wrongful change of direction by the Vancouver. From the deck of the ferry-boat it appeared as if the Vancouver would run the former down in an instant.

There was no time for reflection or precaution. For acts done under such circumstances the law does not hold parties, who are otherwise innocent, responsible. In City of Paris, 9 Wall. [76 U. S.] 638, Mr. Justice Swayne, in considering a similar case, says: "The acts complained of were done in the excitement of the moment and in extremis. Whether they were wise, it is not material to inquire. If unwise, they were errors and not faults. In such case the law in its wisdom gives absolution."

The claimant, however, impliedly admitting that under ordinary circumstances the Vancouver ought to have passed astern of the ferry-boat, alleges in its answer that it was prevented from so doing by reason of the wire cable of the latter being stretched level with the water from the boat to the east shore until it reached the middle of the river. The evidence does not sustain the allegation; on the contrary, the weight of it is decidedly against it.

The river deepens quickly from the west shore, so that at one hundred feet from such shore it is about eighty feet deep; from thence it shoals gradually to the east shore, and within one hundred feet thereof is about ten feet deep. The rope weighs something over four tons, and lies on the bottom of the river, and is taken up and passed astern as the ferry boat moves back and forth. In crossing, in time of high water and strong wind, there is an unusual pressure upon the boat down stream. This makes it describe a line slightly curved down stream, and to this extent the cable is tightened and drawn near the surface of the water. Under these circumstances the claimant gave some evidence tending to prove that if the Vancouver crossed the wire when near the surface her rudder might catch on it, and become unshipped.

But the evidence shows that the Vancouver, which drew about two feet of water, could cross the wake of the ferry-boat within fifty feet of it with perfect safety, when the latter was three hundred feet from shore. In my judgment it is not possible for the ferry-boat, under any lateral pressure which it can sustain, to lift this cable and hold it taut upon the surface of the water at a distance of one half or even one fourth of the way from either shore. In company with counsel, I crossed the river on the boat when the water and wind were both strong and the cable sank out of sight in one hundred and fifty or two hundred feet from either shore. The evidence shows that steamboats have often crossed the wake of the ferry-boat within forty feet, and that no accident has ever happened to any boat on account of the wire.

But even if it were true that it was unsafe for the Vancouver to cross the cable in the wake of the ferry-boat, when the former gave the signal to pass to the left, she was not justified in attempting to cross the bow of the ferry-boat. She was free and could move in any direction, while the ferry-boat could only move back and forth in a straight line. She should have stopped, gone aside or turned back if necessary—indeed, she should have crossed the wire and risked her rudder rather than a collision and the destruction of both boats and the lives of the people on board.

The claimant also insists that the cable of the ferry-boat is an obstruction to navigation, and unlawful, and therefore the libellants cannot recover. Upon this point, evidence was produced by both parties. The great preponderance of it goes to show that the cable is not an obstruction, in any sense that would make it unlawful. In some sense, or degree, every vessel that is launched upon the river is an obstruction to its navigation. The portion of the surface of the river occupied by it cannot be occupied by another at the same time, and the result is that neither can have the unrestricted or unobstructed use of the river without collision with the other. But such an obstruction is not an unlawful one. What is an unlawful obstruction must always depend upon the circumstances of the particular case. The Wallamet river is a public highway, free and open to be navigated by any kind of vessel for any purpose, not specially prohibited by law. So long as any such vessel, however guided or propelled, does not actually prevent or render hazardous the navigation of the river by others, I suppose it cannot be considered an obstruction to navigation in the ordinary sense of the term.

1 Pars. Shipp. & Adm. 547, cites Potter v. Pettis, to show that a vessel may lawfully obstruct the navigation of a stream by extending a warp across the entire channel, provided it be lowered on the approach of another vessel, so as to permit it to pass in the usual channel.

But upon this point it is not necessary to speak absolutely. In my judgment it is immaterial whether this cable is or was an unlawful obstruction to the navigation of the river or not. If it is, proceedings may be had by any one who is aggrieved by it, to abate it as a nuisance. Granting that it was an unlawful obstruction to the free navigation of the river, the Vancouver was not, therefore, justified in wilfully running down the ferry-boat, or placing herself in such a position with reference to her as to render a collision unavoidable. The Vancouver knew of the existence and condition of the cable when she left her wharf on the day of the collision. She was then offered two thirds of the channel on the west side on which to back down across the line of the cable as usual. For some reason she declined the offer, and steamed up the river as if she was going to Oregon City on an excursion. Upon this the ferry-boat went ahead, as she had a right to do, and as she saw the Vancouver turning down stream, signaled to her to pass to the right. Under these circumstances, it was the

duty of the Vancouver to have slowed her engine so as to give time for observation and deliberation, if there was any probability of danger in crossing the cable astern of the ferry-boat, as is alleged by the claimant. If the strain upon the cable on account of the force of the current and the wind was likely to bring the cable to the surface, it was not a new thing under the circumstances, and the pilot of the Vancouver must have been familiar with the occurrence. In any event, the Vancouver should have passed astern of the ferry-boat, as there is little doubt she might have done with perfect safety, or else kept away until the ferry-boat had moved so far west as to make it certain, in the judgment of the pilot, that the cable had sunk astern of her.

On the whole, it appears that the pilot of the Vancouver not only erred in attempting to pass to the left of the ferry-boat, but that he did so under circumstances that evince an almost wanton disregard of the safety of the latter and her passengers and crew. Being alone in fault, the Vancouver must compensate the libellant for the injury done to his boat and wire.

The libel alleges that the libellant has sustained damages to the amount of $2,000, but the proof does not support the allegation.

The wire cost originally, in San Francisco, $1,060, and had been in use from October, 1872. After the collision it was taken up, spliced, and put down again, and has been in use ever since. Forty feet of its length was consumed in making the splice. At the splice it is probably as strong as anywhere, but it is rough, and will wear the sheaf faster on that account. The evidence upon the injury to the wire is meager and vague. Levi Knott, the son of the libellant, states that it is of no value for that ferry—for what reason he does not say, except the additional friction on the sheaf from the splice, and that it is now too short for very high water. Foster, the pilot on the ferry-boat, thinks it is damaged $500. This is all the evidence on the subject, except the view of the court. I find the libellant has sustained damage by the collision as follows:

Injury to the guard and apron of the ferry-boat, $100; wages of an extra hand half a month, while the boat was run with a steering-oar, $25; loss of one third of usual receipts during same period, $162; cost of taking up and splicing wire cable, $150; loss of forty feet of cable used in making splice, $40; general depreciation in value of whole cable from decrease of length, and being spliced, $450—total, $827. These figures being made upon coin estimates, and the decree being made in currency, I add twelve per cent. to this amount, making in all $926.24, for which a decree will be entered for the libellant.