---

## The Swan.

### (*District Court, S. D. New York.* February 1, 1884.)

1. SHIPPING—OBSTRUCTION TO NAVIGATION—ROPE ACROSS CHANNEL—DAMAGE—PROXIMATE CAUSE.

    A rope stretched across the archway of a bridge and over the principal channel of a navigable river, and remaining 24 hours, is an unlawful obstruction of navigation.

2. SAME—WHEN JUSTIFIABLE.

    Wherever such rope or warp may be used, it is justifiable only for a temporary purpose, those who use it making provision for loosening it to allow vessels to pass, and giving timely notice of its existence.

3. SAME—CASE STATED.

    Where a rope was stretched across the west archway of High bridge, for the purpose of keeping a canal-boat a few feet distant from the abutment of the bridge where there were sunken spiles, and the boat might have been breasted off equally well by the use of planks upon the wharf, and the passenger steamer S., after landing within 150 feet of the abutment, proceeded with the flood-tide through the main channel, no notice being given of the rope which was under the water in the middle, and visible only where the ends came from beneath the surface, and those on the boat being unable to loosen it at once, and in the strong tide it being dangerous for the S. to remain in contact with the rope, *held,* that the use of the line in this case was unnecessary and was an unlawful obstruction; that the cutting of the rope by those on the steamer was lawful; and that the steamer was not liable for any damage subsequently sustained by the canal-boat. *Held, also,* upon the facts, that the damage to the canal-boat from settling upon the spiles arose after a considerable interval, during which the boat might have been breasted off from the spiles; that the cutting of the line was not the proximate cause of the injury; and that on these grounds also the libel should be dismissed.

This action was brought to recover damages for injuries to the canal-boat C. B. Simon, on the fifteenth day of July, 1881, on the west side of the Harlem river, at High bridge, caused through a line by which she was fastened having been cut by those in charge of the steam-launch Swan. The Simon had arrived at High bridge the day previous, loaded with coal, and moored on the west side of the river, along-side of the bulk-head which extends northerly from the westerly abutment along the shore, and which is on a line flush with the inner side of the abutment. The canal-boat lay with her bows to the northward and her stern projected part way through the western archway of the bridge. Beneath the water and near the bottom were the remains of a crib extending around the abutment two or three feet from its base, the outer margin of which consists of spiles which had been cut off a foot or two above the bottom. To prevent boats moored along the bulk-head and the abutment from settling down upon these spiles at low water, they were usually fended off so as to be outside of the line of these sunken spiles. This was sometimes done by means of planking passing from the wharf to the boat, and sometimes by a line run from the end of the boat at the abutment and stretched across the western archway and fastened to a spike driven into the second abutment of the bridge not far from the surface of the water at high tide. The stern of the Simon was kept off by a line fastened in the manner last described. The Swan was a small steamer plying in the summer season between Harlem bridge and High bridge for the carriage of passengers. Her usual landing place at High bridge, upon the west side, was at a float, known as Riley's float, upon the western edge of the channel directly below, and about 150 feet southerly from the western abutment of the bridge. Her usual landing on the east shore was about the same distance above the bridge. The principal channel is under the western arch of the bridge, which is of about 70 feet span. The middle arch, though usually having about six feet of water at low tide, was much less used for passage. Around the second abutment there were loose stones extending some distance to the southward which interfered somewhat with the approach to the middle arch, and rendered a cross-ways approach to it dangerous; and under the eastern arch the water was too shoal for navigation. The ordinary course of the Swan upon her trips, both in going and coming, was through the western arch, not only by reason of the deeper water there, but especially, also, because upon the flood tide, after landing at Riley's float, the Swan could not in the short space between that and the bridge get far enough out into the river to make the middle passage without danger of running upon the rocks by the second abutment, except at great inconvenience and by special appliances which she did have aboard for first shoving her bows or her stern out into the river. After making her landing at Riley's float, upon her first trip on the fifteenth of July, the Swan proceeded in the manner usual at flood tide through the western arch-

way, and when close to it observed for the first time the line stretched across it, which in the middle was beneath the water and was visible only where the two ends came out above the surface. Shouts were given from the Swan to loosen the line, and some effort was made by the wife of the libelant on board of the boat to unfasten it there, but it was so secured that it could not be readily loosened, and the Swan having run afoul of it, and the captain apprehending danger both to the boat and passengers in the strong flood tide, after a few minutes ordered it cut, which was done. The canal-boat afterwards got upon the sunken spiles, which in the ebb tide made holes in her bottom, causing the injury for which this libel was filed.

*J. A. Hyland*, for libelant.

*Edwin G. Davis*, for claimant.

BROWN, J. There can be no doubt that the archway across which the line was stretched was the principal channel for navigation in the Harlem river, under High bridge. The landing at Riley's float has been in use for many years. The course from that landing, through the middle archway, upon a flood tide, would be attended by such obvious inconvenience and dangers as cannot rightfully be imposed upon persons entitled to navigate the river in the ordinary course of navigation. The line stretched across the western archway was, therefore, in my judgment, plainly an unreasonable obstruction to the navigation of the river, which could only be lawfully put there very temporarily, or at seasons when the channel was not in use for ordinary navigation. While such lines or warps may doubtless be used temporarily for mooring and handling vessels in rivers or harbors, they cannot be lawfully continued so as to form a permanent ob-struction to navigation. Those who make use of them must be pre-pared to give seasonable notice of them to approaching vessels to avoid danger, and make seasonable provision for their passage.

In *Potter* v. *Pettis*, 2 R. I. 487, the court say:

"The plaintiffs had a right to extend their warp across the entire channel of the river, if there were no vessels passing, but on the approach of another vessel it was their duty to take notice of such approach, and to lower their warp so as to give ample space in the ordinary traveled part of the channel for her to pass, and to give timely notice of the space so left."

In *McCord* v. *The Tiber*, 6 Biss. 410, the court say:

"The respondent had no right to obstruct the channel with a line across it in that manner. * * * If it was for the safety of the boat to make a line fast to the shore, or to use a line attached to the shore as a necessary as-sistance in getting off the bar, she should have taken care to get it out of the way of all passing vessels, either by dropping it, so that they could pass over it safely, or by casting off one end. The obstruction not being removed so as to let this raft pass over or under it in safety, was manifestly illegal."

See 1 Pars. Adm. 547; *The Vancouver*, 2 Sawy. 381.

In this case no attempt was made to give seasonable notice to the Swan of the existence of this line across the archway before she left Riley's float, or afterwards, until she was close upon it. Such a

line was not easily distinguishable, and the pilot of the Swan is not, so far as I can see, chargeable with any negligence in not perceiving it in time to avoid it. Those on the Simon could not loosen the line, though requested to do so. The Swan could not safely remain any length of time in contact with the line, and the only alternative was to cut it, as was done, which, under such circumstances, as I must hold, the captain had a legal right to do. There was no actual necessity for the use of this line by the Simon at all. The boat might have been breasted off by the use of planks, and that, as the laborer Dunn stated, has been latterly the more usual method. The line had been thus used by the Simon for 24 hours, forming a plainly illegal obstruction of the channel.

While, therefore, upon the ground above stated, I should be constrained to hold that any loss occasioned by the line's being cut was through the libelant's own fault, and not through any legal fault in the Swan, upon the other facts of the case, also, the weight of evidence seems to show that the damage to the boat was not the proximate result of cutting the line. It was high water that day at Governor's Island at about 10 minutes before 12, and it could not have been high water at High bridge until between 2 and 3. The libel states that the line was cut at about 11 o'clock, and the libelant so testified. The answer does not state the hour, but says that the flood tide was then about three-quarters full, which would place the time between 11 and 12. These statements in the pleadings, with other direct evidence in accord with them, should be held controlling, notwithstanding some contrary evidence which was given on the part of the libelant. While the tide, therefore, was rising rapidly, it was impossible that the injuries complained of could have arisen immediately after the line was cut. The discharge of coal continued until 3 o'clock, and until nearly that time the tide was rising; after that it fell, and the settling of the boat upon the spiles with the falling tide must have taken place at or after that time. During the interval there was abundant time for the libelant to take all necessary means to shove his boat off and out of the way of the sunken spiles. The libelant himself says the effort to get the boat off was *soon* after the line was cut,—from five to fifteen minutes afterwards. But the libel is so full of gross errors in its statement of facts as to detract much from the credit to be given to the libelant's case, and I cannot accept as true the statement of some of the libelant's witnesses, that when the line was cut the boat immediately got upon the spiles and could not be removed.

On both grounds, therefore, the libel should be dismissed, with costs.