ALBINA FERRY CO. *v.* THE IMPERIAL AND THE S. G. REED.

*(District Court, D. Oregon. March 28, 1889.)*

1. TOWAGE—COLLISION—LIABILITY OF TUG.
    A tug, employed by a ship to move her from her anchorage in the Wallamet river to a dock in East Portland, under the direction and control of the pilot in charge of the ship, is not liable for injury caused by a collision of such vessel with another. In such case the tug and tow are but one vessel, and that one is the tow.

2. NAVIGABLE WATERS—OBSTRUCTION.
    A wire cable, used as a guide across the Wallamet river by the ferry-boat of the Albina Ferry Company, when held up within 11½ feet of the surface of the water, at 18 feet from the end of the boat and 150 feet from the shore, in water over 30 feet in depth, in the vicinity of the approach of sea-going vessels, to the Irving dock in East Portland, is a material obstruction to navigation, and unlawful, unless sanctioned by the legislature.

*(Syllabus by the Court.)*

In Admiralty.

*P. L. Willis*, for libelant.

*Cyrus Dolph*, for the S. G. Reed.

*Edward N. Deady*, for the Imperial.

DEADY, J. This suit is brought by the libelant, the Albina Ferry Company, to recover damages in the sum of $500, alleged to have been caused by a collision of the ship Imperial, while being towed by the steam-boat S. G. Reed, with the ferry-boat Veto No. 2.

The facts appear to be as follows: Between 1 and 2 o'clock in the afternoon of September 14, 1888, Albert Betts, a Wallamet river pilot, was employed to dock the Imperial at the Irving dock, in East Portland, and for that purpose obtained from the claimant, the Oregon Railway & Navigation Company, the use of the steam-boat S. G. Reed and crew.

The Imperial was lying at anchor in the river some distance below Montgomery dock, in Albina, and to the west side of the river. Her length is 198 feet, and her beam 38 feet. She had just arrived from Wilmington, Cal., in ballast, and was 15 feet out of water and 13 feet in.

At the time of the collision the Veto No. 2 was being run by the libelant, a corporation formed under the laws of Oregon, under a license, as a ferry-boat between her slip or landing on the east side of the Wallamet, in Albina, just south of river lot 19, and her landing on the west side of the same, on lots 26 and 27, in the Couch addition to Portland; the width of the river between such landings being about 1,200 feet. North of the ferry-slip the river front is occupied for about 1,000 feet by the Allen & Lewis warehouse and the Montgomery dock. About 100 feet south of the ferry-slip is Shaver's wharf, and Irving's dock is about 350 feet south of the same.

In the space between the ferry-slip and Shaver's wharf is a small floating wood wharf or pontoon, with a waiting-house on it. The ferry-boat is run on a steel wire cable three and a half inches in circumference, and fastened to the shore at either end. The cable is supported by and passes over a sheave or block held in a hanger 18 inches above the wa-

ter, which is fastened to the under side of the guard on the upper side, and at each end of the boat, about 18 feet from the end of the same.

The Veto, when in its slip on the east side, extends about 60 feet into the water beyond the dock line, and immediately off the outer end thereof the water is from 25 to 30 feet deep, and deepens to the middle of the river.

At the time of the collision, the cable off the end of the boat was within 10 feet and 5 inches of the surface of the water, and at 18 feet beyond, it was within 11½ feet.

The Reed made fast to the Imperial on her starboard side, and the two vessels, propelled by the wheel of the former, and navigated as one, under the charge of Pilot Betts, started up stream, heading eastward for the lower end of Montgomery dock. The wind was blowing from the east, according to the report of the signal-office, at the rate of six miles an hour; and, to avoid being blown over to the west side, the pilot purposed to keep the vessel under the lee of the docks on the east side.

When the vessel was within 100 feet of the dock line, at the lower end of the Montgomery dock, she was straightened up the river, and the engine on the Reed stopped to lessen the headway; but the vessel commencing to drift to the west, at about 300 feet from the ferry-slip the engine was "started up" again, and at about 100 feet therefrom it was stopped again, and the vessel moved along in the direction of Irving's dock at not exceeding two miles an hour.

At this time the ferry-boat was at her east landing, under the charge of a collector and engineer, who had seen the Imperial coming up the river, some 600 or 700 feet away, and thought, as they say, that she was going to stop below them, because she was so close in to the docks. There were some vehicles and passengers on the boat, apparently bound west. The collector and engineer were on shore examining the condition of the cable and the pontoon on which the boat made its landing. As the Imperial came in front of the slip the engineer saw her, and being, as he says, alarmed at her proximity to the ferry-boat, he jumped on board, ran into the engine-room, and commenced to work her ashore into the slip, which the collector says he did.

And here arises the disputed question in the case. It is alleged by the libelant that the Imperial ran on and against the apron of the ferry-boat and pushed it around and up stream, until the cable broke, when it gave way in the direction of the shore, and allowed the ship to pass on to the dock. On the other hand, the claimants insist that the Imperial did not strike the ferry-boat at all, and was not nearer to her than 20 feet, but that in passing along at that distance or more in front of her, the keel of the Imperial caught the cable of the ferry-boat, and pulled the latter around until the cable parted or pulled loose from its fastenings on the bank.

Neither the collector nor the engineer of the ferry-boat can say that the Imperial touched her, because they were not in a condition to see whether she did or not. The collector was on shore, and I suppose the house on the ferry-boat obstructed his view. However, without expla-

nation, he says he could not see whether the ship touched the boat or not. The engineer was in the engine-room and could not see, but he says he felt a jar, which he thought was caused by a collision of the vessels.

One witness called by the libelant, Marshal Peterson, who was engaged in shingling a small wharf-house to the south and in the immediate vicinity of the ferry-boat, says the ship struck the apron of the ferry-boat, and pushed it around. John Lund, who was called by the libelant, and was also shingling on the same house, says the ship was 15 or 20 feet from the boat. She struck the cable, and turned the boat around. Arthur Bell, who was on Shaver's wharf at the time, says the ship did not touch the ferry-boat, and that she was between 20 and 30 feet away from her. Albert Betts, the pilot in charge of the Imperial, says the ship was 20 or 30 feet away from the ferry-boat; and that, as the latter came abreast of the ship's forerigging, he saw the ferry-boat commence to move away, when he knew that the ship's keel had caught the cable. He immediately gave orders to back the engine, but before the ship could be stopped something parted or gave away, the boat righted, and the ship passed on.

On this testimony it must be found that the ship did not collide with the boat, and that she passed outside of her at least 20 feet. There is scarcely any room for doubt on the subject. Peterson appears to have been very much alarmed for his own safety, and must be mistaken.

Several independent circumstances in the case also point to the same conclusion.

For instance, the apron of the boat does not appear to have sustained any appreciable injury. One of the witnesses for the libelant says it was twisted some. The hanger at the outer end of the boat, through which the cable passed, was torn out of the guard. Now, if the apron had been caught between the Imperial on the lower side and the cable on the upper, it would have been seriously injured, if not destroyed.

And, if the Imperial had so come in contact with the apron and thereby pushed the boat against the cable, it is not possible that the hanger by which the latter was supported could have been pulled out. But if the Imperial caught the cable on its keel, 20 feet distant from the boat, and thereby dragged the latter around, and up stream, it is easily seen that the hanger might have been pulled out or given away, as it did.

The actual damage sustained by the occurrence is not very great. The injury to the boat is estimated by the manager of the libelant at $100, to the pontoon $25, and to the cable $200. A carpenter who examined the boat in December says that the repairs to it, then "in sight," would not cost to exceed $40. The cable was parted near the end, and by fastening it lower down on the bank, as has been done, it is as serviceable as ever. Still its value is undoubtedly diminished somewhat. But without more explicit testimony on the subject the court would not be warranted in finding that its value was diminished $200 or any considerable portion of such sum. The pontoon was not actually injured, but the cable was fastened to it, and thereby it was pulled out of place; and in getting it back it had to be more or less taken to pieces.

On this state of facts counsel for the owners of the Reed insist that the steam-boat is not liable for any damages which the libelants may have sustained.

The Reed was employed by the pilot of the Imperial for the purpose of towing that vessel, and at the time of the collision was in the control of and in the service of the ship. There is no evidence of any fault, negligence, or misconduct on the part of the steam-boat or any one employed on her.

Under these circumstances the steam-boat and ship constituted but one vessel, and that vessel was the ship. The tug was the mere servant of the tow, and both were under the control and direction of the pilot in charge of the latter. Admitting for a moment that a wrong has been committed, the owners of the Imperial, through their agent, the pilot in charge, are the wrong-doers, and their vessel is alone liable therefor. The owner of the Reed did not participate in the supposed wrong, neither by itself nor its servants. As well say that the wrong of a person who recklessly rides another down in a public thoroughfare is the wrong of the liveryman from whom he hired the horse. *The Creole*, 2 Wall. Jr. 512; *The Sampson*, 3 Wall. Jr. 14; *Sturgis* v. *Boyer*, 24 How. 124; *The Maria Martin*, 12 Wall. 44; Cohen, Adm. 225.

It is not denied that there may be and have been cases in which both tug and tow are liable for the damage sustained by a collision. But in such case both participate in the management of the vessel, and the negligence or misconduct causing the same. *The Civilita,* and *The Restless,* 103 U. S. 699, is such a case.

The libel is dismissed as to the S. G. Reed.

The liability of the Imperial depends on the right of the libelant to maintain this cable in the river where and as it was, when caught on the keel of the vessel.

In my judgment the cable was not slack enough,—was held too near the surface of the water. At 18 feet from the end of the boat, in water over 30 feet deep, and in the line of the approach to public docks, it was held within 11½ feet of the surface, when it ought to have been at least 20 feet below the same. Eighteen feet from the end of the boat is 36 feet from the point where the cable passes through the hanger, and commences to descend into the water. It ought to descend at an angle of not less than 45 degrees, so that in 30 feet or less of water it would be on the ground in 36 feet from the hanger, or 18 feet from the boat, in a horizontal line. In such case it would be safe for any vessel drawing not more than 20 feet of water to pass within 20 feet of the ferry-boat, at least when lying in or at her slip, without any special strain on her cable.

It may be admitted that it is not so convenient to run a boat on a slack line as a taut one. But it must be borne in mind that there is no authority for obstructing the navigation of the river with this cable, and therefore it must be managed, even to the inconvenience of the ferry-owners, so as not to constitute a material obstruction to navigation.

This question has been before this court before. In *The Vancouver*, 2

Sawy. 381, it was considered and dismissed, with the suggestion that whether a ferry-cable is an obstruction or not must depend on the circumstances of the particular case.

In *Ladd* v. *Foster*, 31 Fed. Rep. 827, the court said:

"It is not claimed that there is any legislative authority for stretching this cable across the river, and using it as is done by the defendant, the Albina Ferry Company. A cable lying on the bottom of the river is not an obstruction to navigation, while, if stretched across at or near the surface of the water, it would be. Between these extremes it may depend on circumstances. When a ferry-boat, running on a cable stretched loosely across the river, in comparatively still water only takes the wire off the ground a few feet in the front and rear of it, as it passes along, no material obstruction to navigation may result."

In *Atlee* v. *Packet Co.*, 21 Wall. 395, the supreme court held that a pier built in one side of a channel of the Mississippi river, as part of a boom for holding saw-logs adjacent to a mill, without legislative authority, was unlawful, and the person who erected and maintained it there held liable in damages for a collision between it and a barge descending the river, although there was ample space for passage of the vessel further out in the stream.

But, although the cable at the point where crossed by the Imperial was an unlawful obstruction to navigation, that fact would not justify the pilot of the Imperial in wantonly or negligently running his vessel afoul of it. In such case the Imperial would be held liable for half the damages sustained by the libelant. Id.

But there is no evidence tending to show that the pilot knew this cable was so near the surface of the water, or that he was negligent in not ascertaining the fact. Indeed, he states in his testimony that he had previously passed safely over the cable of this ferry, in the same vicinity, at a less distance from the boat, with a vessel drawing 20 feet of water.

The use of cables in the maintenance of ferries on the Wallamet river appears to be a great convenience, if not a necessity. This being so, it may be said that ships and other means of navigation should be required, as in the case of bridges, to yield some portion of their abstract right to move at pleasure on or through the water, for the benefit of the ferries. But the legislature is the only authority that can be invoked for this purpose. So long as the cable is used without the sanction of the legislature, and the court finds as a matter of fact, that in the instance before it, the cable is a material obstruction to navigation, it must give judgment accordingly. The libel is dismissed, and the claimants must have a decree for costs.