Edward P. BLAKE, Libellant,

v.

UNITED STATES of America,
Respondent.

Odell M. BLAKE, Libellant,

v.

UNITED STATES of America,
Respondent.

Eldridge COOK, Libellant,

v.

UNITED STATES of America,
Respondent.

Nos. 416–418.

United States District Court
E. D. Virginia,
Newport News Division.

March 10, 1960.

Ferguson, Yates & Stephens, Wm. McL. Ferguson, Newport News, Va., Catesby G. Jones, Jr., Gloucester, Va., for libellants.

John M. Hollis, U. S. Atty., Norfolk, Va., Wm. C. Baker and Thomas P. Griesa, Trial Attys., Dept. of Justice (Admiralty & Shipping Section), Washington, D. C., for respondent.

WALTER E. HOFFMAN, District Judge.

In three actions consolidated for trial, libellants seek damages for the alleged taking, without compensation, of certain oyster grounds in the lower York River between Tue Marshes Light and Gloucester Point, and for the unlawful removal of stakes and buoys delineating the boundaries of the leaseholds; said oyster grounds having been lawfully leased by libellants, or their predecessors in title, from the Commonwealth of Virginia.

The area in controversy is in the immediate vicinity of Yorktown, Virginia, where, on the south side of the York River, the Naval Mine Warfare School is located. Libellants' oyster grounds are situated, in part, on the north side of the natural channel and, as to the remainder, north of the northern boundary of said channel.

In 1948 there was established, pursuant to law, a Naval Anchorage Area in the lower York River. While grounds 5 and 6, hereinafter indicated, encroached to some extent upon the Anchorage Area, this is of no consequence as far as the issues here are involved.

On February 9, 1955, the District Engineer, Norfolk District, United States Army Corps of Engineers, issued a public notice, announcing that the Commandant, Fifth Naval District, had requested the establishment of a Naval Mine Sweeping Practice Area and a Naval Drill Minefield Area in the lower York River. It was never contemplated that explosives would be used and the Drill Minefield Area was of a "dummy" variety. The notice, containing a map of the lower York River showing the boundaries of the proposed areas and the latitude and longitude of the corner points of the areas, invited all interested persons to present objections to the proposed regulations. Copies of this notice were mailed to numerous parties interested in navigation and fishing (but not to libellants), as well as to various governmental agencies, including the Commissioner of Fisheries of Virginia. Copies were likewise sent to local area newspapers for publication, and to postmasters in the general area including those at Bena, Gloucester and Gloucester Point, towns near which the libellants reside or have places of business. From an examination of this notice it is clear that an interested party, holding an oyster ground lease at or near the north side of the channel, would not be able to determine the precise location of the Naval Areas and the possible overlapping of the oyster grounds, without the assistance of actual surveys of the oyster grounds and Naval Areas.

A public meeting attended by representatives of navigation and fishing interests was held at the Naval Mine Warfare School on March 17, 1955, at which time there did not appear to be any objections registered to the proposed regulations establishing the three Naval Areas. Thereafter, on May 3, 1955, the Secretary of the Army promulgated an amendment to 33 C.F.R. 207.128, in part prescribing the three Naval Areas in the lower York River as the Naval Mine Sweeping Practice Area, the Naval Drill Minefield Area, and the Naval Anchorage Area, the latter having been in effect and contained in other sections of the Code of Federal Regulations since 1948.

The Naval Mine Sweeping Practice Area is considerably larger than either the Drill Area or Anchorage Area, both

of the latter being contained within the Mine Sweeping Practice Area. With the exception of the extreme southwest corner, the Drill Area is contained within the Anchorage Area. For all practical purposes, subject to a minor variation, the northern boundaries of the three Naval Areas were the same.

Subsequently, on June 2, 1955, the District Engineer at Norfolk issued a public notice announcing the amendment to 33 C.F.R. 207.128, effective thirty days after its publication in the Federal Register on May 24, 1955. This notice was likewise sent to all *known* interested parties, the press, and to post offices in the area known as Tidewater Virginia. There is no evidence that libellants had any actual knowledge of these notices. The notice included a description of the three Naval Areas and the mine-laying and mine-sweeping practice areas were also shown on a reproduced portion of Coast & Geodetic Survey Chart 492.

The regulation, as amended, so far as it may be pertinent, provides with respect to the Naval Mine Sweeping Practice Area (the largest area) as follows:

"(4) No structures or obstacles such as fish traps, beacons, buoys, piles, or dolphins shall be placed in the area described in subparagraph (a) (3) [Naval Mine Sweeping Practice Area] without prior approval of the Commanding Officer, Naval Schools, Mine Warfare, Yorktown, Virginia."

"(7) These regulations shall be enforced by the Commanding Officer, Naval Schools, Mine Warfare, Yorktown, Virginia, and such agencies as he may designate."

Libellants were the lawful holders of oyster ground leases issued pursuant to the laws of Virginia. Their grounds, and the approximate extent to which they encroach upon the three Areas are summarized below:

| Ground No. | Owner-Libellant | Acreage | Acreage in Restricted Areas |
|---|---|---|---|
| 3 | Edward P. Blake | 35.17 | None |
| 4 | Eldridge Cook | 16.27 | 0.47 |
| 5 | Edward P. Blake | 20.68 | 16.27 |
| 6 | Odell M. Blake | 81.51 | 34.68 |
| 11 | Odell M. Blake | 27.72 | 1.52 |

Note: A portion of grounds 4, 5, 6 and 11 are located in that part of the York River which had been designated as Naval Mine Sweeping Practice Area or Naval Anchorage Area, or both. A portion of ground 6 is likewise situated within the Navy Drill Minefield Area, said portion having been calculated to be 25.30 acres.

The libellant, Odell M. Blake, owned other oyster grounds in the general locality, but the grounds hereinafter listed did not encroach upon or overlap any of the three Areas designated for Naval purposes:

Ground No. 8  —  16.80 acres
Ground No. 9  —  12.10 acres
Ground No. 10 —  45.00 acres

As to the three grounds above, as well as the entire acreage in the *other* grounds heretofore mentioned, it is contended that the respondent's operations damaged and unreasonably interfered with the use and management of the oyster grounds to such an extent that they destroyed the same.

With respect to grounds 3, 4, 5, 6, and 11, libellants contend that there has been a "taking" within the meaning of the Fifth Amendment to the Constitution of the United States for which the respondent must pay "just compensation" akin to eminent domain proceedings.

That libellants maintained, at the time of the 1955 amendment to the regulation, numerous stakes and buoys as oyster

ground markers within and without the Naval Mine Sweeping Practice Area is conceded. It is further admitted that at no time did libellants apply for or receive permission from the District Engineer or Commanding Officer of the Naval Mine Warfare School to place buoys or stakes in the York River area. Libellants, apparently ignorant of any encroaching or overlapping area, made no effort to remove the stakes or buoys and continued to mark their grounds.

In the spring of 1956, the Naval Mine Warfare School determined that certain stakes and buoys, lying south of the northern boundary line of the three Naval Areas, would have to be removed. The authorities made a "half-hearted" attempt to secure information as to the names of the owners of the stakes and buoys by making a verbal inquiry from a local representative of the Virginia Commission of Fisheries, which inquiry was to no avail. Undoubtedly, however, the authorities at the Mine Warfare School could have secured this information by the exercise of due diligence.

All parties admit that numerous stakes and buoys were removed by the Government from the area south of the northern boundary line of the three Naval Areas during March and April, 1956, and later three markers were removed in November, 1957. An estimate of the number removed ranges from 61 to 100. While the evidence is in conflict, the Court does not feel that libellants have carried the burden of proving that any stakes or buoys were removed from the area north of the northern boundary line of the three Naval Areas heretofore designated. The estimates of distances at times when Naval vessels were allegedly north of the northern boundary of the Naval Areas are insufficient to persuade the Court in light of positive testimony to the contrary offered by respondent.

We turn, then, to the legal principles applicable to the claims of libellants respecting the removal and destruction of stakes and buoys within the Naval Areas described, thereby rendering the oyster grounds, marked by said stakes and buoys, valueless.

We think it clear that libellants had "private property" in the oyster grounds and markers within the meaning of the Fifth Amendment. Jackson v. United States, 103 F.Supp. 1019, 122 Ct.Cl. 197. The law of Virginia specifies that the leasehold interest in an oyster ground shall be construed as a "chattel real". Code of Virginia, 1950, § 28-124(13). "Chattels real" are generally held to be private property within the intendment of the Fifth Amendment. United States v. Petty Motor Co., 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729. The leases are alienable, descendible, renewable as of right for a definite term, and constitute a valuable means of livelihood. As such, the leases possess all of the elements held essential to constitute "private property" in the Jackson case. While it is true that the meaning of "property" as used in the Fifth Amendment is a federal question, it will normally obtain its content by reference to local law. United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206.

Moreover, the stakes and buoys, assuming that they are considered to be personal property, are protected by the Fifth Amendment. Causby v. United States, 75 F.Supp. 262, 109 Ct.Cl. 768, following remand of United States v. Causby, supra.

Manifestly it seems that, subject to the Government's dominant power over navigation, a lease of oyster grounds, pursuant to state law, on beds of navigable streams within the state, constitutes "private property" in the lessee. Lewis Blue Point Oyster Co. v. Briggs, 229 U.S. 82, 33 S.Ct. 679, 57 L.Ed. 1083.

Respondent relies upon the provisions of 33 U.S.C.A. § 403 to defeat libellants' claim of "private property", contending, in substance, that under federal law the libellants had no right to place the markers where they were located. Section 403 is divided into three clauses; the first requiring Congression-

588

al authorization for the creation of any obstruction to the navigable capacity of any of the waters of the United States; the second prohibiting, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army, the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or *other structure,* in any navigable river or other water of the United States, outside established harbor lines, or where no harbor lines have been established; and third, prohibiting, unless recommended by the Chief of Engineers and authorized by the Secretary of the Army, the excavating, filling, or in any manner altering or modifying the course, location, condition or capacity of the channel of any navigable water of the United States.

As there has been no Congressional approval of the markers, the respondent argues that they are "obstructions" prohibited by the *first* clause of § 403. We do not agree. The first clause of § 403 must be read in conjunction with the second and third clauses of the same section, wherein the power of approval has been delegated to executive officers. The purpose of the statute is to prohibit unreasonable obstructions and leaves the reasonableness to be determined by executive officers, other than obstructions included within 33 U.S.C.A. § 401, which must be approved by Congress. This construction is in accord with State of Wisconsin v. State of Illinois, 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426. There is, however, reputable authority to the effect that a substantial fish net structure is an "other structure" within the meaning of the second clause of § 403 wherein the Act refers to "other structures". Alaska Pacific Fisheries v. United States, 9 Cir., 240 F. 274, affirmed on other grounds, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138.

■ It is apparent that Congress has seen fit to reserve to itself, or otherwise delegate to other officers, the responsibility of determining what "obstructions" can be presented or removed from navigable waters. Such determination once made is conclusive. United States v. Chandler-Dunbar Power Co., 229 U.S. 53, 64, 33 S.Ct. 667, 57 L.Ed. 1063. The judiciary is without power to control or defeat the will of Congress so long as that branch of the Government does not transcend the limits established by the supreme law of the land. Greenleaf-Johnson Lumber Co. v. Garrison, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939.

In a broad sense of the word, the issue now before the Court is substantially controlled by United States v. Commodore Park, 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017, a case arising in this area. In Commodore Park, the Government dredged a tidewater navigable bay and deposited the dredged materials in a navigable arm of the bay called Mason Creek, thereby destroying its navigability, and impairing certain benefits alleged to inhere in the proximity of the land to a navigable creek. The purpose of the dredging was to provide suitable waters for the operation of large seaplanes. The Court held that, merely because the laws of Virginia gave the landowner title to land between the high and low water marks, this fact did not give grounds for compensation under the Fifth Amendment if the market value was impaired as a result of work done by the United States in the interest of improvement of navigation, citing United States v. Chicago, M., St. P. & P. R. Co., 312 U.S. 592, 596–598, 61 S.Ct. 772, 85 L.Ed. 1064, wherein the dominant power of the Government to control and regulate navigable waters in the interest of commerce was superior to the rights of one who under state law may hold "technical" legal title to the property.

■ Thus it follows that where, in the judgment of Congress, or its agents, a structure appears in a navigable stream which may affect the regulation of commerce, it is subject to the dominant power to cause the removal of such structure, even though the structure be "private property" and originally not unlawful. As was said in Commodore Park, 324 U.S. 391, 65 S.Ct. 805:

"In short, as against the demands of commerce, an owner of land adjacent to navigable waters, whose fast lands are left uninvaded, has no private riparian rights of access to the waters to do such things as 'fishing and boating and the like', for which rights the government must pay. Riparian rights of access to navigable waters, cannot, as against the government's power to control commerce, be bought and sold."

While the markers here in controversy were not "obstructions" under the first clause of 33 U.S.C.A. § 403, Congress has exercised its constitutional power to include such markers as "structures" which authorized executive officers could prohibit as unreasonable obstructions to navigable capacity, after initially following certain requirements as to notice, hearing, etc., all of which was done in this case.

There was, of course, authority for the erection of oyster ground markers in the first instance under 33 C.F.R. 206.50, in which a "fishing structure" is defined as including "oyster ground markers", but this authority is strictly limited by express wording in that (1) the authority does not set aside any area of navigable water exclusively for fisheries or oyster grounds; (2) it does not give any property rights or exclusive privileges; (3) no grant of authority may supersede any danger zone or *restricted area* established by regulations prescribed by the Secretary of the Army, (4) the United States is not liable for damage to fishing structures placed which may be caused by or result from operations undertaken by the United States for the maintenance or improvement of any waterway, for the protection of the public right of navigation, or for flood control purposes, and no claim or right to compensation shall accrue from any such damage; (5) the District Engineer, upon determining that any fishing structure causes an unreasonable obstruction to navigation, may cause the owner, upon notice, to remove same at owner's expense; (6) fishing structures improperly located, and not removed by the owner, may be summarily removed by the District Engineer; (7) oyster ground markers may be placed outside or channelward of established fishing structure limits under such conditions as may be prescribed by the District Engineer.

■ It is conceded that libellants never requested the District Engineer to permit the erection or maintenance of oyster ground markers outside or channelward of any established fishing structure limit, and that no conditions were ever prescribed by the District Engineer. It is clear that the Government has granted no authority which is superior to its dominant power to control and regulate navigable waters, and this is true even though, under Virginia law, the libellants have a "private property" interest in the oyster grounds and markers.

The Naval Anchorage Area, established in 1948 pursuant to 33 C.F.R. 202.166(a) (1), was never abandoned or relinquished by the Government, as is evidenced by the incorporation of this Area in 33 C.F.R. 207.128, in 1955. The Anchorage Area did not forbid the erection and maintenance of oyster ground markers, but the 1955 regulation did contain such a prohibition as to the Naval Mine Sweeping Area in 33 C.F.R. 207.128(b )(4). Respondent's attempt to incorporate a prohibition with respect to the Anchorage Area is without merit, even though the regulation does provide that the Anchorage Area is reserved "for the exclusive use of naval vessels". The words "exclusive use" contemplate the anchoring of vessels only.

The ultimate issue here does not particularly involve the paramount power to aid navigation which is generally conceded. More accurately it is whether there has been a "taking", under the facts of this case, in the exercise of that dominant power in aid of navigation. Libellants urge that the "taking" of the oyster grounds, and subsequent removal of the markers, was not an "aid to navigation" because:

(1) The markers are so insignificant when compared to other obstructions re-

moved in aid of navigation as to reach "that bad degree" reviewable by the courts.

(2) There was no semblance of a purpose to aid navigation as such, or to improve navigable capacity.

Whatever may be the merits of libellants' contentions, we fear that the authorities preclude any holding in their favor. As was said in State of Arizona v. State of California, 283 U.S. 423, 456, 51 S.Ct. 522, 526, 75 L.Ed. 1154:

"And the fact that purposes other than navigation will also be served could not invalidate the exercise of the authority conferred, even if those other purposes would not alone have justified an exercise of Congressional power."

For the purpose of this discussion, we assume that the sole reason for prohibiting structures or obstacles, such as buoys, in the Naval Mine Sweeping Practice Area was to permit naval vessels to effectively conduct their practice operations. But in Commodore Park the libellants' argument has been effectively foreclosed. See also: Greenleaf-Johnson Lumber Co. v. Garrison, supra; United States v. Chandler-Dunbar Power Co., supra; Scranton v. Wheeler, 179 U.S. 141, 162, 21 S.Ct. 48, 45 L.Ed. 126; Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523. Cf. Portland v. Luckenback Steamship Co., 9 Cir., 217 F.2d 894; The Swan, D.C., 19 F. 455.

Libellants' reliance upon Jackson v. United States, supra, United States v. Gerlach Live Stock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231, and, to a lesser extent, Carr v. United States, D.C., 136 F.Supp. 527 (the latter being a decision of this Court from which no appeal was taken), appears to be misplaced. In Carr, the Army, in search for the remains of an aircraft which exploded when striking the river, conducted extensive dragging operations which destroyed certain oyster grounds. This Court said (136 F.Supp. 534):

"It is obvious that the paramount right of navigation was not intended to cover extensive dragging operations to recover parts of a totally destroyed aircraft. Such dragging operations do not constitute 'navigation' in the sense of granting a paramount right."

From the foregoing it is abundantly clear that the Carr decision is inapplicable to the factual situation here presented.

The Jackson case, decided by the Court of Claims in 1952, is, to a limited extent, favorable to the present libellants. In redefining the restricted areas of the Aberdeen Proving Grounds, the Government took an island and its adjacent waters to specified points, including the plaintiff's fishing grounds. The Court of Claims, acting pursuant to a Senate Resolution directing it to determine the plaintiff's legal or equitable rights, said, by way of dictum (103 F.Supp. 1020):

"While the Government may, to protect and improve navigability, forbid the private use of navigable waters, it may not do so for some other purpose not related to commerce. United States v. Gerlach Livestock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231, affirming 76 F. Supp. 87, 111 Ct.Cl. 1, 69–72."

The opinion does not precisely state the purpose for which the Government enlarged its restricted area, but it is reasonable to assume that it was for target purposes as indicated by the Court's reference to Portsmouth Harbor Land & Hotel Co. v. United States, 56 Ct.Cl. 494; Id., 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287. Thus, the "taking" was not in furtherance of navigation.

Nor do we agree that United States v. Gerlach Live Stock Co., 339 U.S. 725, 70 S.Ct. 955, is applicable. The Court there held that the construction of the Friant Dam reclamation project was not an undertaking which bore some positive relation to control of navigation such as in Commodore Park. Undoubtedly there must be a navigation purpose, but it need not be a commercial navigation purpose.

The Secretary of the Army announced, on May 3, 1955, that the three restricted Areas created by 33 C.F.R. 207.128 were established pursuant to 33 U.S.C.A. §§ 1, 3, which latter sections invoke the benefit of navigation as a purpose. Such action is sufficient to proclaim the purpose of navigation for, in State of Arizona v. State of California, supra, the Supreme Court found a purpose to aid navigation in a statute which, while itself naming navigation as a primary purpose, subjected its project to an inter-state compact in which navigation was subservient to all other interests.

Finally, libellants say that, even if the respondent was exercising its dominant power over navigation, there is a policy under 28 U.S.C. § 1497 and 33 U.S.C.A. § 3 favoring oyster ground planters and fishing interests in general. These arguments may be of interest in the Court of Claims or before a Congressional Committee, but they cannot be applied in the District Court. Moreover, the respondent's immunity from liability for removal of obstructions to navigation as stated by the regulations cannot be waived by a policy not precisely set out in the statute.

Respondent has urged that the actions are time-barred. It is unnecessary to consider this point but, if considered, it is clear that the actions are not time-barred. 28 U.S.C. § 2401(a); United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789, in which the Court applied the six-year period of limitation under the Tucker Act to an action for the recovery of the value of an easement taken by the United States for the purpose of flooding plaintiff's property.

A decree in accordance with this memorandum will be prepared by proctors for respondent and, after presentation to proctors for libellants for inspection, may be transmitted to the Court for entry.

This memorandum is adopted by the Court in lieu of specific findings of facts and conclusions of law, pursuant to General Admiralty Rule 46½, 28 U.S.C.