Thos. J. Wood, Stites, Wood, Helm & Taylor, Louisville, Ky., for libelee.

## BASS v. SOUTHERN BELL TEL. & TEL. CO.

No. 30.

United States District Court
W. D. Kentucky, at Louisville.

July 24, 1953.

SHELBOURNE, District Judge.

This action was begun May 5, 1952, when the plaintiff, as widow, sole heir and administratrix of the estate of Leo Bass, filed her libel in personam against Southern Bell Telephone and Telegraph Company,. seeking to recover $79,008.20 damages alleged to have been sustained by her and by her deceased's estate on account of his death which occurred on the Ohio River near Louisville, Kentucky, June 15, 1951.

The answer of the libelee denied any negligence on its part and pleaded contributory negligence and alleged that decedent's death resulted from the negligence of the crew of the United States Engineers Derrick Boat Whirler No. 638, when the boom of the derrick boat collided with a cable over the Portland Canal on the Ohio River at Louisville, when the Whirler No. 638 was navigating that channel.

The case was tried to the Court February 24, 1953.

The Court makes the following

### Findings of Fact.

1. On June 15, 1951, libelant's intestate, Leo Bass was killed when struck by the boom of Whirler Boat No. 638, owned by the United States Engineers, which collided with libelee's telephone cable over the Portland Canal at Louisville, Kentucky. His wife, Mrs. Lottie Bass, duly qualified as administratrix in Jefferson

County, Kentucky, and filed this libel in Admiralty against libelee for damages arising out of his death, alleging that his death was caused by the negligence of libelee in permitting its cable to sag or loosen so as to become an obstruction to navigation.

2. On August 10, 1926, pursuant to the provisions of 33 U.S.C.A. § 403, libelee was granted a permit by the Secretary of War to erect an aerial cable across the Ohio River at a point 2,349 feet upstream from the head of the lock at Dam No. 41, Louisville, Kentucky. The blueprints accompanying the application for the permit show that the lowest point of this crossing was to be 497 feet above sea level. At the time the permit was issued, the normal pool stage of the Ohio River at that point was 412 feet above sea level, and the permitted crossing therefore provided a vertical clearance of 85 feet above the existing pool stage.

3. The cable was originally constructed by libelee in conformity with the permit.

4. One of the conditions of the permit granted to libelee was:

"(f) That if future operations by the United States require an alteration in the position of the structure or work herein authorized, or if, in the opinion of the Secretary of War, it shall cause unreasonable obstruction to the free navigation of said water, the owner will be required, upon due notice from the Secretary of War, to remove or alter the structural work or obstructions caused thereby without expense to the United States, so as to render navigation reasonably free, easy, and unobstructed."

5. Between August 10, 1926, and November 12, 1928, the formal pool stage of the Ohio River at Louisville was raised to an elevation of 420 feet above sea level. The Chief of the Administrative Branch of the Louisville office of the United States Engineers thereafter exchanged the following correspondence with libelee:

"Address reply to
"The District Engineer
"423 Customhouse

War Department
United States Engineer
Office ENP:ELS
Louisville, Kentucky
November 12, 1928

"Refer to File No ——
"Subject:
"Southern Bell Telephone & Telegraph Co.
"525 S. Fifth Street
"Louisville, Kentucky
"Gentlemen:
"Referring to War Department permit. dated August 10, 1926 for aerial cable across the Ohio River upstream from the head of the lock at Dam No. 41, Louisville, Ky. there is inclosed herewith a letter of Mr. E. H. Groot, Associate Engineer, dated November 2nd recommending the elevation of this cable to 90 feet above the present pool stage. The low point is now at elevation 494.0 or 3 feet below that shown on the plans accompanying the permit. Recently an accident occurred to this cable and it is believed that the elevation is too low.

"It is expected that in the early spring a contractor will begin work of the construction of an auxiliary lock at this location and it is possible that further damage and interference with telephone service will occur if the cable is permitted to remain at its present elevation. Mr. Groot recommends that the cable be raised to elevation 510. Your views in this matter are requested. By direction of the District Engineer:

"/s/ E. N. Parker
"E. N. Parker
"Chief, Administrative Division
"1 Incl.
"Letter of Mr. Groot
"D. O. Form 38
"April, 1928"
"Louisville, Kentucky: Development Clearance of Cable Across Ohio River
"Copy: Mr. M. A. Erskine,
"District Manager,
"Louisville, Ky.

"Mr. C. L. Newton,
"District Plant Chief
"Louisville, Ky.

"11,21–28 HLP

"Mr. E. N. Parker,
"Chief, Administrative Division
"United States Engineers Office
"Louisville, Kentucky

"Dear Sir:

"This refers to your letter of November 12th, concerning the raising of our cable across the Ohio River at Dam 41 at Louisville, Kentucky.

"This is to advise that we have been making arrangements to raise our cables, however it will require very high poles and they can only be secured from southern yards and it will require sometime for us to secure the necessary material.

"We will handle this matter at our earliest possible convenience and we thank you for calling this matter to our attention.

"Yours truly,
"Kentucky Plant Superintendent"

"Address Reply to
"The District Engineer
"423 Customhouse
"War Department
"United States Engineer Office
"Louisville, Ky. ENP:els

"Refer to File No. —— June 17, 1929
"Southern Bell Tel. & Tel. Co.,
"525 S. Fifth St.,
"Louisville, Ky.

"Gentlemen:

"Further reference is made to letter of this office of November 12, 1928 and your reply of November 21, 1928 relative to the raising of the cable across the Ohio River at Dam No. 41, Louisville, Ky.

"To date this cable has not been raised and the Assistant in Charge at the Louisville and Portland Canal advises that the only work done by your Company towards raising this cable is the installation of one pole on the north bank. This pole was installed several weeks ago but since then, no further work towards raising the cable has been done.

"It is requested that arrangements be made to complete this work at an early date.

"By direction of the District Engineer:

"/s/ E. N. Parker
"E. N. Parker
"Chief, Administrative Division"

"Louisville, Kentucky: Development: Raising Cable across the Ohio River.

"7-3-29 HLP.

"Mr. E. N. Parker,
"Chief, Administrative Division,
"War Department,
"United States Engineer Office,
"Louisville, Kentucky

"Dear Sir:

"This refers to your letter of June 17th, concerning the raising of the cable across the Ohio River at Dam No. 41, Louisville, Kentucky.

"This is to advise that the work was completed on June 24th, 1929.

"Yours truly.
"Kentucky Plant Superintendent."

6. On June 24, 1929, libelee completed the raising of its aerial cable to a minimum elevation of approximately 507 feet above sea level, or 87 feet above the new pool stage. As then constructed, the lead and copper cable which carried the telephone messages was attached to and supported by a 10,000 pound test steel messenger strand, and these were in turn supported by a 16,000 pound test steel messenger strand which was attached near the top of the poles at either end of the crossing. The span between poles was 371 feet. Libelee's employees replaced portions of this structure in 1947 and 1948, in each instance replacing the cable at the same elevation. The only change made in the crossing was the substitution of a lighter lead and copper cable for the original cable.

At the time of the construction, the libelee's cable had a minimum elevation of 507 feet above sea level, or 87 feet above the existing stage.

7. No witness testified for libelant that the cable had sagged from its original height before the accident. Libelee's proof was to the effect that the cable was as much as 81 feet above the water at the point of collision at the time of collision. Libelee's proof was all to the effect that the wire had never sagged until the force of the collision caused it to sag and that after the accident the cable was 81.9 feet above the water at the point of the collision.

There was no dispute in the testimony that after the collision, based upon actual measurements, the cable was 81.9 feet above the water, so that the Court finds that at the time of the collision, the cable was not less than 81.9 feet above the water at the point of collision.

8. The maximum vertical clearances for navigation provided by the various bridges over the Ohio River near the point of the accident (Mile 605.3) are:

Big Four Railroad bridge (mile 602.9)— 77.5 feet

Louisville Highway bridge (mile 603.5)— 72.6 feet

Pennsylvania Railroad bridge (mi. 604.4) —69.8 feet (open)

18th Street Highway bridge (mi. 604.6)— 70.0 feet (open)

27th Street Highway bridge (mi. 606.8)— 80.0 feet (open)

K & I R.R. and Highway bridge (mi. 607.-4)—98—100.1 feet (lower pool)

9. Libelee's witness, Ridgway, testified that Libelee was unaware that any such elevation appeared in the navigation charts up to the day of the trial, and that it had no record of ever supplying such information to the Engineers.

There was no evidence introduced that libelee was responsible for the figure used on this chart.

10. On June 25, 1951, libelant's decedent, Leo Bass, was employed by the United States Engineers at Louisville, Kentucky, as a mate. At the time of the accident, he was assigned as deckhand on a "Pusher Boat" belonging to the Engineers, which was engaged in pushing the Engineer's derrick boat "Whirler No. 638" up the Portland Canal from the drydock near the head of Lock No. 41 at Louisville to a point in the canal upstream from libelee's cable.

11. "Whirler No. 638" was originally delivered to the Engineers on February 12, 1951. It was a steel-hulled barge which carried a derrick or crane capable of revolving 360° horizontally, and of lifting a dead weight of 15 tons. The boom of the crane, from tip to hinge pin, was 85 feet 11¾ inches in length. The hinge pin was located 5 feet 11¼ inches above the deck, and the deck, on the day of the accident, was 3 feet 2 inches above the water. The maximum elevation of the boom was 76° above the horizontal, at which angle the boom extended more than 92 feet above the water.

The "Whirler No. 638" had not been up the Portland Canal under libelee's cable prior to the accident. Robert Tual, Assistant to the Chief, O. & C. Division, U. S. Engineers, testified that it had the highest boom of any floating equipment belonging to the Engineers. Gibson, the crane operator, stated that the tallest crane theretofore in use at Louisville had a height of 68 feet.

12. As the "Whirler No. 638" started up the canal in the tow of the pusher boat, Gibson, its crane operator, lowered the boom from its maximum elevation to an angle which he estimates at 45–60° above the horizontal. He did not refer to the indicator in the cab of the "Whirler" boat to determine the exact angle of the boom. He was aware of the existence of the libelee's cab crossing, but had no information as to its height other than his own observation. He did not know the elevation of the Whirler Boat's boom after he had lowered the angle, but set it at a height which he believed would clear the wires. The boom was extended out in front of the flotilla.

13. As the pusher and Whirler boats proceeded up the Canal, Charles Birkemeyer acted as pilot on the pusher. The weather was clear and the visibility good. The river was at normal pool stage in the upper pool. Prior to that time, the Engineers had issued written instructions to its employees to make certain that they had

sufficient clearance before taking floating stock under aerial crossings. Birkemeyer's view ahead was obstructed by the housing which enclosed the engine and control room of the "Whirler". He was aware of the existence of libelee's aerial crossing, but did not know how high it was. Birkmeyer did not rely on the Navigation Charts, but he stated on re-direct examination that he knew how high the wire should have been. He did not know how high Gibson had set the boom. Birkmeyer first saw the wire over the top of the cab on the "Whirler" just before the boom hit it. Gibson, the crane operator, testified that Birkmeyer put the engine of the pusher boat into reverse, but was unable to stop the flotilla before it passed under the wire. The boom on the "Whirler" struck the cable, and was forced back until it bent over the cab and fell toward the stern, killing Bass.

14. Bass, Alva Gibson (the crane operator), Howard Frost (deckhand on the Whirler) and Clyde Steelman (lock and dam repair foreman) constituted the remainder of the crew of the flotilla. They stood in a group at the forward end of the "Whirler", near the starboard side, talking. Gibson and Steelman were aware of the existence of libelee's aerial crossing, but did not testify to having any information, other than their own observation, as to its height. None of them were acting as lookout. None of them saw the cable in sufficient time to warn Birkmeyer and enable him to stop the flotilla. As the boom struck the cable, Bass ran back along the starboard side of the flotilla to a position to the right of Birkmeyer, where he was struck by the falling boom, and killed.

### Conclusions of Law.

I. Neither the War Department nor its successor, the Department of the Army, has by order required libelee to raise the elevation of its cable above 497 feet above sea level, the elevation allowed by the permit dated August 10, 1926, permitting the libelee to erect the cable.

The District Engineer on November 12, 1928, suggested that the elevation of the cable be raised to 510 feet above sea level and subsequent correspondence between the District Engineer and libelee, particularly the letter of July 3, 1929 amounts to a representation by libelee that its cable had been raised to a height of 510 feet above sea level. This representation would preclude the necessity for issuance of formal order requiring raising of the cable and if this were an action between the Government and libelee, the latter would be estopped to contend that it had not been required to raise the cable to 510 feet.

II. Aside from its representation that the cable was at an elevation of 510 feet above sea level, libelee was required by its permit not to maintain an unreasonable obstruction to free navigation.

On the basis of the showing that every overhead obstruction in the vicinity of libelee's cable, with the exception of the K. & L. Bridge, was lower than the cable, the Court concludes as a matter of law that the cable was not maintained as an unreasonable obstruction to free navigation.

It had existed for more than twenty years without any known interference with navigation and at the time of the accident, could not be said to restrict the reasonable use of the canal which it spanned.

III. The persons in charge of the "Whirler Boat No. 638" on which plaintiff's decedent met his death, had not had access to the correspondence between the libelee and the Government with reference to the elevation of the cable. No inquiry is shown to have been made about the height of the cable and there is no evidence that any reference was made to a navigation chart to determine the elevation.

The Navigation Chart in evidence shows that the cable was at an elevation of 517 feet and there is no explanation in the testimony as to the source of this figure.

It is concluded from the testimony that the only source of information relied upon by those in charge of the "Whirler Boat" upon the occasion in question was their own observation of the cable. Therefore, any representation as to its height by libelee to the District Engineer in its correspondence was of no significance.

IV. Libelant's decedent, Leo Bass, met his death as a result of the negligence of the crew of the pusher boat and "whirler No. 638". There was a failure on the part of that crew to keep a proper outlook ahead. The significance of this failure is particularly important because they were maneuvering an extremely high piece of equipment under a cable crossing, the existence of which was known to them and all they had to do was to lower the boom on the "Whirler" boat to insure safety in passing under the cable.

V. In the case of Southern Bell Telephone & Telegraph Company v. Burke, 5 Cir., 62 F.2d 1015, 1017, a recovery of damages was sought in Admiralty by the owner of a steamer which collided with telephone wires suspended over a navigable stream. Discussing the duty of one maintaining such a crossing of a navigable stream, the Court said

"Whether the presence of the wires over the river was or was not an unlawful obstruction of a navigable stream within the meaning of the statute (33 U.S.C.A. § 403), the appellant, knowing the use of the river by passing vessels, by installing and maintaining the wires, incurred the duty of exercising reasonable care to provide such clearance as would enable vessels to pass under them with safety * *."

Applying this rule to the facts in this case, it appears that the cable was at least 81.9 feet above the water at the point of collision.

The "Whirler" boat which collided with the cable had the highest boom of any vessel in the Louisville district. It had never before been taken up the canal to the point where the accident occurred. It would be requiring more than reasonable care to require the Telephone Company to have anticipated that a new vessel carrying an extraordinarily high boom would be operated under a cable for the first time by a crew which would take no significant precaution to prevent colliding with the cable which was known to be there and which was in plain sight.

In the Burke case, supra, the master of the vessel had inquired of the Telephone Company whether his vessel would clear the telephone wire crossing. He was informed by the Telephone Company that the clearance was adequate. The addition of lower wires by the Company had rendered the clearance unsafe and in connection with that situation, the Court said

"* * * by complying with a request of one in charge of a vessel desiring to pass under the wires for information as to their height, [appellant] incurred a duty to give such information as was not likely, presently or in the future, to be harmfully misleading to those in whose behalf information was sought. The William J. Dailey, 2 Cir., 263 F. 78; F. S. Royster Guano Co. v. Outten, 4 Cir., 266 F. 484; Demopolis Telephone Co. v. Hood, 212 Ala. 216, 102 So. 35.

"* * * We think the evidence warranted the conclusions, that, in the circumstances disclosed, the appellant was chargeable with negligence in installing and maintaining the wires with which the vessel's smokestack collided without giving any notice or warning of the change of conditions to the appellee or those in charge of the operation of his vessel, who, in the absence of such notice or warning, were justified in acting in reliance on information previously given by the appellant as to the height of the wires above and the amount of clearance between them and the top of the vessel's smokestack; and that the injury complained of was proximately caused by that negligence."

The Telephone Company, in the present case, made no representation to the crew of the "Whirler No. 638" that the cable was 90 feet high.

Libelant cites Watson v. Kentucky Indiana Bridge & Railway Company, 137 Ky. 619, 126 S.W. 146, 129 S.W. 341, in support of the proposition that the height of the cable and not any negligence on the part of the "Whirler" and the push boat crews was the proximate cause of Leo

Bass' death. The Watson case decides that where a railway tank car was derailed so that gasoline spilled into the street, the question of responsibility of the railway for an explosion which followed a third person's striking a match near the fumes should be submitted to the jury. The lower Court had directed a verdict for the railway.

The Watson case is authority for the proposition that a concurrent cause or intervening act which was unforeseen will not relieve from liability one guilty of primary negligence.

The facts in the instant case are materially different from the facts in the Watson case. In the latter case the primary negligence consisted of permitting a huge quantity of gasoline, an extremely dangerous substance, to escape into a public street at night.

In this case, the primary negligence claimed is permitting a cable crossing to be at a height of 81.9 feet, rather than at some higher elevation.

This cable had existed for more than twenty years during which time traffic on the canal passed safely beneath the cable. Only the unusual height of the boom of the "Whirler" boat can be said to have caused the accident and the height of the boom could have been readily reduced by those in charge of its operation.

Libelant also cites the case of Louisville Home Telephone Company v. Gasper, 123 Ky. 128, 93 S.W. 1057, 1059, 9 L.R.A., N.S., 548. In that case, the plaintiff was a pedestrian who recovered judgment against the Telephone Company and one Darnell for injuries sustained when Darnell's negligently driven wagon collided with the Telephone Company's negligently located wire and overturned against plaintiff. Proof of the plaintiff in that case was that the guy wire ran along a fence so near its color as to render the wire practically undiscernible, and to have been anchored at a point extending out into the alley 18 inches. There the Court said, quoting from Thompson's Negligence, Section 1233

"If a telegraph, telephone, or electric light company so erects its poles, or suspends its wires, as to make the highways dangerous to ordinary travel, and if a traveler, proceeding with ordinary care, comes in contact with its poles or wires so erected or suspended and thereby sustains injuries, he or any other person having a right of action for such injury may recover the resulting damages of the company."

The evidence in this case is not convincing that the cable made the canal dangerous to ordinary travel.

VI. Regardless of the actual height of the cable, it was plainly discernible and nothing about the height of it would interfere with the duty of the crew in charge of the "Whirler" to take some precaution to avoid a collision between the boom on the boat and the cable. They should have become aware of the potential danger created by the cable and their failure to do so leaves the height of the cable as a mere circumstance attendant upon the accident and not its proximate cause. 65 C.J.S., Negligence, § 111, page 692; Turpin v. Scrivner, 297 Ky. 365, 178 S.W.2d 971; Merlo v. Public Service Company of Northern Illinois, 381 Ill. 300, 45 N.E.2d 665.

The Court concludes that the cause of Leo Bass' death was the negligent failure of the crew in charge of the "Whirler" boat to use ordinary care in navigating the canal with the boom on the "Whirler" boat at an elevation which caused it to collide with the cable of the libelee across the canal, the presence of which was known to those operating the boat and the elevation of which was a matter of plain observation, with nothing to obscure the view.

Therefore, the libel will be dismissed and an appropriate order will be submitted by libelee's Proctor upon notice to Proctor for libelant.